[Civil No. 3829. Filed September 27, 1937.]

[71 Pac. (2d) 1022.]

DIXON FAGERBERG, Appellant, v. PHOENIX FLOUR MILLS COMPANY, a Corporation, J. T. MELCZER and R. C. BLAIR, Appellees.

228

Messrs. Favour & Baker and Mr. A. M. Crawford, for Appellant.

Messrs. Armstrong, Kramer, Morrison & Roche, for Appellee Phoenix Flour Mills Company.

LOCKWOOD, J.—Phoenix Flour Mills Company, a corporation, hereinafter called plaintiff, brought suit against Dixon Fagerberg, hereinafter called defendant, for the sum of $55,090.28. The action was based upon the theory that defendant, J. T. Melczer, and R. C. Blair were at the times mentioned in the complaint directors of plaintiff corporation, and that they, conspiring and confederating together, used certain funds belonging to it, without its authority, to speculate in wheat on the stock market, and that by reason of such diversion and unauthorized use of these funds the plaintiff has lost $110,180.57, for which it was claimed defendant, Melczer, and Blair were jointly and severally liable to plaintiff. It was further alleged that Melczer had already paid to plaintiff on account of said liability $55,090.28, which had been credited thereon, and judgment was asked against defendant Fagerberg for the balance of the money which it was alleged had thus been illegally converted, together with interest. Shortly thereafter defendant moved that Melczer and Blair be brought in as parties defendant, on the ground that the complaint showed they were jointly involved with defendant in the transactions above described, and that if there was any liability it was a joint and several one. The court granted the motion, and they were duly made parties defendant. Thereafter there were many motions to strike and to make more definite and certain, demurrers and requests for bills of particulars, and other voluminous pleadings, which we refer to more specifically as necessity requires, and the case finally came to trial on the second amended complaint before the court sitting with a jury.

The parties took practically a week to introduce the evidence found in the record, and, when all had rested, plaintiff moved that the jury be discharged, and the court render judgment in favor of plaintiff and against all of the defendants as prayed for in the complaint. Counsel for defendants Blair and Fagerberg moved separately for a directed verdict in favor of their particular defendant. The motion for the last-named defendant, however, was later withdrawn, whereupon the court stated that it was willing to consider the case as an equity action, and upon such assertion counsel for defendant Fagerberg renewed their motion for judgment in favor of the latter, whereupon the jury was discharged from further consideration of the case, none of the parties objecting to such action upon the part of the court. It was then ordered that the case be submitted to the court upon briefs, and, this being done, judgment was finally rendered in favor of plaintiff and against defendants in the sum of $55,090.28, and, defendant Fagerberg's motion for new trial being duly overruled, the latter has appealed to this court.

 There are some twenty-two assignments of error, some raising procedural questions and others going to the merits of the controversy. We will consider the procedural questions in their logical, rather than their numerical, order and then, if necessary, discuss those going to the merits. The first assignment is that the court erred in overruling defendant's motion to make more definite and certain, and his demurrer to the complaint and the amended complaint. This is in reality a triple-barreled assignment, going to three separate and distinct rulings, and for this reason, technically speaking, it is insufficient. However, the assignment does, in effect, question the sufficiency of the complaint, and we will therefore consider it. The gist of the complaint is that Fagerberg, Melczer, and Blair, being directors of plaintiff corporation, con-

spired together for the purpose of using funds belonging to the plaintiff, without its authority and outside the ordinary and usual course of its business, to speculate in the wheat market, and that they did so use them and lost over $100,000 of plaintiff's money, and that their actions aforesaid were concealed from the plaintiff, its stockholders, and the other directors by making false and fictitious entries in the books of the plaintiff, and making false financial reports to the stockholders. Does this state a cause of action against defendants?

It is the general rule that officers and directors of a corporation are authorized to handle the ordinary business affairs of the corporation according to their best judgments, and, if, acting in good faith within the scope of the corporation's ordinary business, they commit errors of judgment, they are not liable therefor, but it is equally true that, if they go outside of the ordinary and usual business of the corporation and engage in transactions unauthorized by its articles of incorporation and not within the ordinary scope of its business, without the consent or ratification of the stockholders, then good faith will not excuse them from responsibility to the corporation for any losses which they may have incurred by reason of their unauthorized and illegal conduct. These two propositions are so elementary that we think it a waste of space to cite authorities to support them.

The complaint alleged that defendants used the funds of the corporation for speculation on the wheat market and that this was outside of the ordinary and usual course of the business of the corporation. The bill of particulars given by plaintiff sets up each specific transaction wherein the money of the corporation was used for the purpose alleged, and the amount of loss in detail. We think this stated a cause of action

and that the bill of particulars furnished was sufficient. The first assignment of error is not well taken.

■ We consider next the second and fifth assignments of error, which are that the court erred in refusing to make all of the directors of the corporation party defendants, and in striking defendant Fagerberg's first plea in abatement, based upon the fact that all of the directors were not so joined in the action. We think there was no error in this respect. The allegation of the complaint was that the wrongful conversion of the corporate funds was carried out by Fagerberg, Melczer, and Blair alone, and such being the case the other directors who, so far as the complaint shows, had nothing whatever to do with the conversion would not be either necessary or proper parties to the proceeding. The plea in abatement for failure to join them was very properly stricken.

■ The next question is covered by the third and sixth assignments of error. Defendant Fagerberg pleaded in bar to the action that the complaint set up a joint tort on the part of himself, Melczer, and Blair, and that the plaintiff had released Melczer from liability for the tort which, as a matter of law, also released Fagerberg and Blair. The plea alleges that defendant Melczer paid to plaintiff some $73,000, and in consideration therefor the plaintiff executed and delivered to Melczer the following document:

"Covenant Not To Sue

"Know all men by these presents:

"That, Whereas, Dixon Fagerberg of Prescott, Arizona, and J. T. Melczer, of Phoenix, Arizona, are justly indebted to the undersigned, Phoenix Flour Mills Company, a corporation, in the sum of One Hundred Twenty-eight Thousand, Five Hundred and 75/100 Dollars ($128,500.75);

"Now, Therefore, for and in consideration of the sum of Seventy-three Thousand Three Hundred Fifty-three and 88/100 ($73,353.88) Dollars, and of other

good and valuable considerations to the said undersigned in hand paid by said J. T. Melczer, the receipt whereof is hereby acknowledged, the said undersigned, Phoenix Flour Mills Company, a corporation, does hereby covenant for itself, its successors and assigns, with the said J. T. Melczer, his heirs, executors, administrators and assigns, that the said Phoenix Flour Mills Company, a corporation and its successors and assigns, will forever refrain from and will not bring any suit, action or proceeding at law or in equity in any court whatsoever, against the said J. T. Melczer, his heirs, executors, administrators or assigns, and will not prosecute, molest or trouble him or his heirs, executors, administrators or assigns, for or on account of any claim which the said undersigned has against the said J. T. Melczer by reason of said indebtedness of One Hundred Twenty-eight Thousand Five Hundred and 75/100 Dollars ($128,500.75); but this covenant shall not affect or prejudice in any way any rights or causes of action the said undersigned, its successors and assigns, may have against the said Dixon Fagerberg on account of said indebtedness.

"It is not intended hereby, and nothing herein contained shall be construed in any way to impair, discharge or release any right which the undersigned has against said Dixon Fagerberg. . . ."

It is, of course, an elementary rule of law that the liability of joint tort-feasors is joint and several and that the release of one releases all. It is contended, however, by plaintiff that the document above set forth is not a release but a covenant not to sue, and that such an agreement with one joint tort-feasor does not release the others. As we have said, from early times a release of one joint tort-feasor released all the others. Eventually, however, it appeared that this frequently was unjust to the injured party. It might be that an amicable settlement with one tort-feasor for a sum less than the total amount of his damages, while still retaining his right of action against the others for the

balance, was the only practical way of securing full compensation for his injury. Finally some ingenious counsel advanced the theory that, while the injured party could not release one of the tort-feasors from liability without releasing the others, he might for a sufficient consideration enter into an agreement with one not to sue him for the tort, and that such an agreement would not bar his right of action against the others. This ingenious method of "whipping the devil around a stump" was seized upon by the courts as a happy solution of the problem, and it was quickly and practically unanimously held that, if, as a matter of law, an agreement with one of several joint tort-feasors was only one not to sue and not a legal release of the liability for the tort, the other wrongdoers might be sued by the injured party and a judgment obtained against them, due credit of course being given for the amount already received on account of the covenant not to sue. There have been many cases before the courts involving this question, and they all agree as to the general rule of law stated above, the vital question in each particular case being whether or not the agreement involved therein was a covenant not to sue or a release and settlement. We must therefore consider the document in question and determine which it was. The phraseology shows clearly that it was most carefully worded by someone who knew the different legal effects of a release and settlement and of a covenant not to sue, and that it was the latter which was intended by the parties. Nowhere therein is there any use of the words "release" or "settlement" or others of similar import in regard to Melczer. Not only that, but it is expressly stated that the covenant does not prejudice the right of the plaintiff against the defendant Fagerberg in any manner whatsoever. Contracts should be construed, if possible, in harmony with the intent of the parties. We think therefore

that the court committed no error in sustaining a demurrer to the plea in bar based on the ground that plaintiff had released Melczer from liability and thus also released Fagerberg, and in ruling that the document above quoted was a covenant not to sue, and not a release.

■ The next question we consider is whether or not the court erred in allowing Melczer and Blair to be cross-examined by plaintiff as adverse parties under section 4416, Revised Code 1928. This question is raised by assignment of error No. 7. We might dispose of it by saying that it does not appear that any objection to the cross-examination based on this ground was made until after the testimony had been admitted, or else that, since Blair and Melczer were made parties defendant at the request of Fagerberg, he is not in a position to claim that they were not, within the meaning of the statute, adverse parties to plaintiff. Further, counsel for defendant Fagerberg, having himself cross-examined the witnesses Melczer and Blair after their examination by plaintiff, might be considered to have waived the motion to strike. We think, however, that the objection may well be disposed of on the merits. In the case of *Brooks* v. *Neer,* 46 Ariz. 144, 47 Pac. (2d) 452, 459, we said, in considering a cross-examination under the statute of a party defendant, ''He was not a mere nominal party but one greatly interested in the outcome of the litigation and this is all the statute requires to give the adverse party the right to cross-examine him.'' We think the court did not err in permitting the plaintiff to cross-examine defendants Blair and Melczer under the statute as adverse parties.

■ The next question which we consider is whether the court erred in taking the case from the jury. It appears from the record that, after all the parties had rested, each one asked for an instructed

verdict in his favor. What is the effect of such motion? In the case of *Garrett* v. *Reid-Cashion Land & Cattle Co. et al.*, 34 Ariz. 482, 272 Pac. 918, 919, this court said:

"Under the common law there were three ways by which the opposing party might test the sufficiency of the evidence to support a case in the course of a trial, and these three are employed variously by the different courts of the Union. They are: (1) a motion for nonsuit; (2) a motion for directed verdict; and (3) a demurrer to the evidence. [Citing case.] The practice in this jurisdiction has uniformly been to ask for a directed or instructed verdict. [Citing cases.]

"Of course, where a directed verdict is adopted as the rule the jury is retained as a part of the machinery of the court. What was done in this case is such a wide departure from the general practice in this jurisdiction that we must conclude that learned counsel, than whom none is more familiar with the rule, intended the jury should have nothing whatever to do with the adult plaintiffs' case nor the minor's case. The purpose of the motion was to get rid of the jury and leave the whole matter to the court, upon the theory that, taking the evidence in its strongest light against the defendants, the plaintiffs had presented no case entitling them to recover.

"The motion, while lacking in form and substance the common-law demurrer to evidence [citing cases], had for its object and accomplishment the same purpose as the common-law demurrer to evidence. The movant thereof accomplished everything that might have been accomplished by a demurrer. When this demurrer or motion was interposed it admitted the truth of all the facts necessary to make out the case of the plaintiffs, and withdrew the case from the jury and submitted the application of the law upon the facts to the court.

"In 26 R. C. L. 1064, § 72, the law is stated as follows:

" 'Where the testimony is adjudged insufficient in law to maintain the action, a final judgment must be pronounced thereupon in favor of the defendant; and

the like judgment must be given for the plaintiff, if the demurrer be overruled, in all cases where the subject-matter of the controversy is such as not to require the intervention of a jury, for the purpose of ascertaining or assessing unliquidated damages. Generally, where the damages are to be assessed, the jury is not discharged, but find a verdict subject to the decision of the court on the demurrer.'

"In *Slocum* v. *New York Life Ins. Co., supra,* [228 U. S. 364, 33 Sup. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029] it is said:

" 'At common law, if on a demurrer to the evidence judgment was given for one party when it should have been for the other, the error was corrected in the appellate tribunal by directing the proper judgment. . . . ,'

"This, we think, is the settled rule upon a demurrer to the evidence. Under the law, if the demurrer to the evidence is overruled and liquidated damages are claimed, judgment may be entered therefor without the aid of a jury; but if the damages are unliquidated, then the parties are entitled to a jury to determine the damages, or they may stipulate, as they did in the Richard Garrett side of the case, and let the court find the damages.

"The practice of demurring to the evidence was recognized at common law and is adopted and made by statute the rule of decision of our courts, unless unfitted to our needs or contrary to the federal or state Constitutions or our laws. Par. 5555, Civ. Code 1913. We find nothing in the laws forbidding it. While the demurrer in this case was informal and defective in substance, it was accepted and acted upon favorably to the appellee, and it, at least, has no right to complain."

We think the effect of the various motions was such that the court was justified under our practice in dismissing the jury, on the ground that all of the parties had agreed there was no controversy in the facts, the issue remaining being one of law for the court. Further than that it appears from the record that, when

the court announced that it was willing to discharge the jury and determine the case itself, no objection was made thereto by any of the parties. We think that such conduct estops the defendant from coming in, after the court has rendered a judgment against him, and claiming that error was committed by not submitting the case to the jury on the facts. This disposes of assignments of error 10 and 12.

The next question is whether the court erred in refusing to admit evidence on the cross-complaint of defendant Fagerberg. It appears from the record that plaintiff demurred to the cross-complaint, which demurrer was overruled before the trial, but that during the trial the court vacated this order and sustained the demurrer to defendant's cross-complaint, and then refused to admit any evidence thereon. No error is assigned as to the action of the court in sustaining the demurrer to the cross-complaint, and we must presume its action was correct. It follows that since the cross-complaint went out on the demurrer, the court very properly refused to allow any evidence in support thereof. This disposes of assignment No. 4.

This disposes of all of the procedural questions which need be considered before the facts shown by the evidence are stated. In stating these facts, we must necessarily adopt the findings of the trial court, unless there is no evidence in the record to sustain them, together with such other ultimate facts as might be drawn from the evidence in the record, if they are necessary to sustain the judgment. We follow this rule in the following narrative statement of facts.

Plaintiff, at the times mentioned in the complaint, was a corporation duly organized and existing under the laws of the state of Arizona, with its principal business being the milling of wheat into flour. It had a board of directors consisting of five persons,

among whom were the three defendants. On September 17, 1927, pursuant to a resolution of the board of directors, an executive committee, with authority to conduct the business of the corporation between directors' meetings, was duly appointed, consisting of defendants Fagerberg and Melczer, and F. L. Ginter, one of the other members of the board. Beginning about September, 1930, and continuing until about April 30, 1932, the defendants Melczer and Fagerberg secretly used the plaintiff's funds in speculation in the wheat market in the purchase of wheat futures on margin, without the knowledge and consent of the other directors or the stockholders, or of Ginter, the other member of the executive committee. As a result of these transactions, on June 1, 1932, it appeared that there had been a net loss of company funds to the amount of $110,180.57. In order to keep a knowledge of the loss from the other directors and stockholders of the corporation, defendant Melczer, who was also president of the corporation, with the consent and approval of Fagerberg, directed and caused defendant Blair, who was secretary-treasurer, as well as a director, of the corporation, to make various false and fictitious entries upon the books of the corporation for the purpose of deceiving its stockholders and other directors, and to make a report of the financial status of the corporation during said period, which also was false and fictitious and made with intent to deceive the other directors and stockholders. The board of directors of the corporation never at any time authorized the executive committee, or the defendants, or any one thereof, to engage in the transactions whereby the funds of the company were lost, as aforesaid, nor did the executive committee authorize such a transaction, and it was not until a meeting of the board of directors held on May 24, 1932, that any of the stockholders or directors of the corporation, with

the exception of the three defendants, learned of the use of the corporation's money as aforesaid by the defendants and of the loss which had resulted thereby. It further appears that at no time was any action taken authorizing any officer or employee of the plaintiff to purchase any futures on margins for speculation for or on behalf of the plaintiff, and that at all of the times such futures were bought by defendants Fagerberg and Melczer, the plaintiff corporation had in its granaries and mills ample hard wheat to supply all of its milling requirements for the particular year in which the purchases were made, and that none of the purchases were made for legitimate hedging purposes. It further appears that no action was taken by the corporation, its directors, or stockholders which would constitute a waiver, election, or estoppel on the part of the corporation to prosecute this action, and that the covenant not to sue, above referred to, was not given or accepted in settlement or part settlement or release of any liability of the plaintiff against defendant Melczer or his codefendant for any of the transactions above referred to.

There were other facts appearing in the record, but we think this is sufficient in order to determine those assignments of error which in substance, although not in form, are that the judgment is not sustained by the findings and the evidence. Let us determine whether this is true. Defendant Fagerberg does not deny, and indeed cannot deny from the record, that the facts just stated by us as found by the trial court are true, with one substantial exception. He claims that the company ratified or authorized the conduct of himself and Melczer by a certain resolution at a directors' meeting held on May 25, 1927. It appears from the record that at that time it was reported to the board of directors that defendants Fagerberg and Melczer had been engaged in certain hedging transactions, and that

the other directors approved such transactions, stating their confidence in Fagerberg and Melczer, and that the latter had superior knowledge of what was necessary to be done. The record shows that the matters reported to the board at the time and the transactions approved by such board referred solely to ''hedging'' transactions. Such things are very different indeed from ordinary speculation upon margins. Hedging is, in substance, a form of insurance by a manufacturer who is forced by the character of his business to anticipate that he will be compelled to purchase large quantities of raw materials in the future. It is not necessary that we go into the details of such a transaction further than to say that its purpose and effect is merely to protect the manufacturer in making future purchases of raw materials without the possibility of any serious loss by fluctuations in their price, and as a corollary he cannot make a very great gain thereby. The buying of wheat futures for speculation on margin is a very different proposition. It is, in substance, a mere betting upon the future price of wheat and is not entered into for the purpose of insuring an actual user of wheat against loss on future purchases, but is carried on for the sole purpose of making a profit by the fluctuation of the market, which necessarily incurs a risk of loss of the entire amount of margin put up. We think the claim that the approval and authorization of what was represented as a hedging transaction to protect plaintiff in necessary future purchases of wheat to be used in its milling business gave authority to defendants to engage in a speculation which was a pure gambling transaction is straining the language of the resolution of May 25, 1927, far beyond reason. The whole record is conclusive to the effect that defendants Fagerberg and Melczer believed they could beat the wheat market, a delusion shared by many other gam-

blers in the past, and that, without the knowledge, consent, or approval of their codirectors and stockholders, they used plaintiff's money in an endeavor to prove their belief, at a net loss to their fiduciary of over $110,000. We think the only reasonable conclusion which could be reached by the trial court on the whole record was that defendants Fagerberg, Melczer, and Blair did use the funds of the plaintiff outside of its ordinary course of business in unauthorized and *ultra vires,* if not absolutely illegal, transactions and that they were jointly and severally responsible for the loss caused thereby.

The evidence is also conclusive that when the matter was discovered, the other officers and directors and the stockholders of the plaintiff proceeded immediately to endeavor to recover by every possible means the amount lost by the corporation; that defendant Melczer admitted his wrongdoing and expressed a willingness to make restitution of one-half of the total loss, it being admitted by all parties that defendant Blair was merely the tool of Fagerberg and Melczer, acting under their express instructions, under penalty of losing his position for failure to carry out such instructions. It also appears that the plaintiff at no time intended to release Melczer, Blair, or Fagerberg from their liability, but, with full knowledge of the legal difference between the two, gave the former a covenant not to sue, and not an agreement of release or settlement.

There are a few other minor objections raised by the brief of defendant, but, in view of what we have already said, we think it would be extending an already lengthy opinion, without any material benefit, to discuss them in detail. The complaint stated a cause of action against the defendant; we find no substantial error in the manner in which the case proceeded to judgment, and the judgment is in conformity

with the substantive law as applied to the unquestioned facts disclosed by the record.

The judgment of the superior court is affirmed.

McALISTER, C. J., and ROSS, J., concur.