[Civ. No. 12304.  First Dist., Div. Two.  July 26, 1943.]

E. A. COOKE et al., Respondents, v. ROBERT S. ODELL
et al., Appellants.

Sullivan, Roche & Johnson for Appellants.

John A. Sinclair and Charles A. Christin for Respondents.

NOURSE, P. J.—This is a stockholders' suit brought by plaintiffs in their representative capacity as stockholders of State Guaranty Corporation, which was made a defendant because it refused to bring the suit. The plaintiffs recovered judgment in the corporation's favor against defendants for alleged misappropriation of and speculations with the corporation's funds while they were directors and officers of State Guaranty Corporation and Pacific States Auxiliary Corporation, its wholly owned subsidiary. The defendants Odell, Falch and Adams have appealed from the judgment of $2000 entered against them which concerned the alleged misappropriation of the funds of State Guaranty Corporation by Odell while on a trip to Europe upon the theory that the trip was only partially for the benefit of the corporation. Defendants Odell and Herrick appeal from a judgment of $130,793.78 entered against them which was the amount of loss on a purchase and sale as an investment of two lots of silver bullion by Pacific States Auxiliary Corporation. Pacific States Auxiliary Corporation, a California corporation, is the wholly owned subsidiary of State Guaranty Corporation, a Delaware corporation. It was organized to manage the foreclosed properties of Pacific States Savings and Loan Company, another wholly owned subsidiary of State Guaranty Corporation. As part of its business it made investments and carried the cash transactions of State Guaranty Corporation also. ■ With respect to the corporate structure, the trial court found that both State Guaranty Corporation and Pacific States Auxiliary were dominated and controlled by Odell through his large holdings of common stock in State Guaranty Corporation and his position as an officer and director of State Guaranty Corporation and Pacific States Savings and Loan Company. This finding is supported by the evidence in the record and appellants' attack thereon is without merit. By virtue of his ownership of shares of common stock of the corporation together with his nomination by proxies of preferred shareholders, the defendant Odell controlled the election of the board of directors and dominated its actions. Odell, Falch, and Adams were directors and in addition Falch was president and Odell was vice-president and director of finance of State Guaranty Corporation. Dur-

ing the period here involved Herrick was an employee of Pacific States Savings and Loan Company and was an officer and director of Pacific States Auxiliary Corporation.

The appellants further contend as to both judgments that the evidence is insufficient to support the findings on which they rest and that both causes of action, if any there were, are barred by the statute of limitations applicable to them. As both transactions were entirely separate the particular facts with respect to each are better stated separately.

The Silver Transactions.

Prior to August of 1935 defendant Odell had actively traded in the silver bullion market. At the commencement of that month he owned 1,310,000 Shanghai dollars—the value of which depended upon the intrinsic value of their silver content. On August 14, 1935, Odell sold 800,000 Shanghai dollars on the London market whereby he made a profit of $80,000. The dollars were then on deposit in the vaults of the Wells Fargo Bank and Union Trust Co. in San Francisco. On August 16, on Odell's representation that silver was a good investment, Pacific States Auxiliary Corporation purchased these same dollars at a cost of $390,400, which admittedly was their then market value. It is not contended that Odell realized any personal profit to the detriment of the corporation from these two transactions. The purchase by Pacific States Auxiliary was made from the Wells Fargo Bank on contracts. One hundred thousand dollars was advanced. This $100,000 was loaned to Pacific States Auxiliary by State Guaranty Corporation. Thereafter as the silver market declined additional advances were made. These Shanghai dollars (theretofore converted into bullion) were sold on February 18, 1936, at a loss of $116,696.65. In September of 1935, also at the suggestion of defendant Odell, Pacific States Auxiliary purchased 500,688 ounces of silver at a cost of $327,325.20. This purchase was also by contract, only $33,000 being advanced. This was sold on December 13th at a loss of $14,097.13.

The findings of fact on which the trial court based its judgment in favor of the corporation on this count are as follows:

"VIII

"That during the years 1935 and 1936 the defendants Robert S. Odell and R. L. Herrick caused Pacific States Aux-

iliary Corporation to engage in speculation in the purchase and sale of silver bullion; that the said purchase of silver bullion was not connected with the business in which said corporation was then engaged, and was highly speculative. . . . That in causing said corporation to engage in said activities, said defendant directors violated the trust they owed to said corporation and to State Guaranty Corporation, and by reason thereof are indebted to said corporation in the sum of $130,-793.78, together with interest thereon.''

## ''XIII

''The Court finds that the plaintiffs did not discover the facts constituting the frauds herein found until within three years of the time of the commencement of the action, nor could they have discovered said facts sooner by exercise of reasonable diligence. That the Board of Directors of State Guaranty Corporation, during the time covered by the transactions set forth in paragraphs VIII and IX, failed to render to the shareholders of State Guaranty Corporation the reports covering the affairs of Pacific States Auxiliary Corporation, as required by Section 358 of the Civil Code of the State of California, and never at any time during the period covered by said transactions submitted any financial statements or profit and loss statements of Pacific States Auxiliary Corporation to the shareholders of State Guaranty Corporation. That the plaintiffs were not permitted to examine the books of account of Pacific States Auxiliary Corporation until approximately September 2, 1939, notwithstanding that permission to make such examination had been requested by plaintiffs, or some of them, prior thereto.''

## ''XVI

- ''The action is not barred by Section 339, Subdivision 1, of the Code of Civil Procedure of the State of California.''

It is conceded by respondents that unless section 338(4) of the Code of Civil Procedure is the statute of limitations applicable to this cause of action, it was brought too late, as the silver purchases were made in 1935, and this suit was not filed until May, 1940. They seek to support the judgment on three theories, actual fraud, constructive fraud and fraudulent concealment tolling the running of the statute. Appellants contend that the above facts show, at most, bad but

honest judgment in making an investment in the ordinary course of the corporation's business. They further argue that the propriety of the investment is to be judged solely by the articles of incorporation which permitted an investment in any kind of personal property.

To support a finding of actual fraud the respondents argue that Odell's representations that the purchases of silver dollars and bullion were good investments were false and were known by him to be false. The respondents rely upon the inference of fraud which might have been drawn from the fact that he did not apprise the other directors that he had just sold the silver dollars which they purchased for Pacific States Auxiliary Corporation. The trial court did not make any finding of actual fraud nor would such a finding have been supported by the evidence. We are faced with the facts that Odell made a profit on the sale of his Shanghai silver dollars of $80,000 and that the silver market remained fairly constant between August, 1935, and December, 1935, a few times rising above the price at which the silver dollars were purchased. On this showing a finding that at the time Odell made the representation it was false or that he believed it to be false would not have been supported by the evidence. Proof of fraud must be clear and convincing and there is no other evidence in the record upon which a finding of actual fraud could have been predicated.

Next respondents contend that by reason of the fraudulent concealment of a cause of action, the running of the statute of limitations thereon is tolled until the plaintiff discovers the facts or should have discovered the facts. Assuming that this proposition of law is correct, there is no evidence in the record upon which a finding of fraudulent concealment by the defendants could be based. The fact that State Guaranty Corporation failed to comply strictly with the requirements of section 358 of the Civil Code relating to the information concerning subsidiary corporations required to appear on the balance sheets of holding corporations is of no value in determining fraudulent concealment because the obligations imposed by section 358 do not specifically refer to foreign corporations. Although foreign corporations are expressly mentioned in sections 355, 356, 359 of the Civil Code, all in the same chapter XII of the Civil Code relating to cor-

porate books and records, their obligations and rights imposed by the chapter are limited to corporate books and records kept within the state. This emphasizes why foreign corporations were not intended to be included in section 358 in that the difficulties of enforcement would be insurmountable. Further it should be noted that section 359, relating to a stockholders' suit to compel the giving of a financial statement, was made applicable only to foreign corporations whose principal place of business was within this state. Section 278 of the Civil Code especially provides that the word "corporation" includes only domestic corporations. We can not agree with respondents that the Legislature in section 278, where it explained what it meant by the use of the term holding corporation, meant to dispense with the use of the word "foreign" if it meant to include foreign holding corporations also. Further support for this view is also found in section 342 of the Civil Code where the Legislature, in referring to the acquisition of shares of corporations by themselves or their subsidiaries, specifically refers to corporations domestic or foreign. Finally, the Delaware corporation laws contain no requirement that a holding corporation render statements concerning the financial position of its subsidiaries to the stockholders annually. Hence no inference of fraudulent concealment can be drawn from the form of State Guaranty Corporation's balance sheet, particularly where the accounts receivable showed a large and increasing indebtedness due from Pacific States Auxiliary Corporation from 1934 to 1939.

■ Respondents next point to the fact that in the beginning of 1935, prior to the silver transactions here in question, defendants refused to allow one Andrews, who had been requested only to go over the books of State Guaranty Corporation for certain stockholders, to look over the books of Pacific States Auxiliary. It is conceded that the facts concerning the silver transactions were at all times on the corporate records of Pacific States Auxiliary. There is no evidence in the record that a proper request to examine the books of Pacific States Auxiliary was ever refused. Hence, no finding of fraudulent concealment could be predicated on the basis of an improper refusal to allow an examination of these books.

Finally, in this connection, the respondents assert that the whole purpose of Pacific States Auxiliary Corporation was to conceal from the stockholders of State Guaranty Cor-

poration the business transactions carried on through Pacific States Auxiliary. We can find no evidence to support this assertion nor did the trial court so find. It is well known that many holding companies are completely inactive and carry on their affairs through their subsidiaries. To hold that on such arrangements alone, a finding of fraudulent concealment could be predicated, would drastically change the burden of proof resting upon one charging fraud.

Respondents finally seek to support the judgment on the grounds that the defendants committed a constructive fraud on the corporation in investing the funds in the silver bullion. They assert that a constructive fraud arises upon the breach of the fiduciary duty of the director in either of two ways under section 2229 of the Civil Code. This section reads as follows: "A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner." Section 2234 of the Civil Code declares a breach of the preceding section to be a fraud against the beneficiary of the trust.

First the respondents contend that the defendants dealt with the corporate funds for their own profit when they invested in the silver bullion. They argue that defendants' main holdings were of common stock and that only by speculation could the common stock have any value as the preferred stock had accumulated dividends for five years which had to be paid prior to common stock dividends. This argument defeats itself. The directors' "own profit" in this case is the same as any other beneficiary of the trust and cannot possibly be said to constitute a use of the corporate property for the benefit of the director as trustee. (*Alderman* v. *Alderman*, 178 S.C. 9 [181 S.E. 897, 105 A.L.R. 102, 120]; *Spering's Appeal*, 17 Pa. 11 [10 Am.Rep. 684, 689].) The tenuous argument that common stockholders would be benefited over preferred stockholders is also defeated by the fact that in order to pay off the accummulated dividends on the preferred shares by such investments as these, many profitable transactions would need to have taken place, buying at the lowest market price for silver in 1935 and selling at the highest level for 1935. Here only one such transaction was entered into which could not possibly have given any value to the common stock, assuming for the purpose of argument that the

common stock at the date of the purchases in question had no value.

■ Secondly, respondents contend that the use of corporate funds for the silver purchases was a use for a "purpose unconnected with the trust, in any manner," and therefore constituted a constructive fraud on the corporation. The respondents argue that although the alleged speculations were not ultra vires "in the strict sense that the articles of incorporation did not permit the buying of silver. . . . The speculations were so foreign to the business of the corporation as to be beyond the powers of the officers." Therefore they argue that the speculations were for purposes unconnected with the trust and constituted a fraud on the corporation. In support of this proposition they cite *City of Fort Bragg* v. *Brandon,* 41 Cal.App. 227 [182 P. 454], in which the trustees of the town gave away an interest in town property. Although a search has revealed no other case involving the final clause of the section, we understand that the words "purpose unconnected with the trust, in any manner" refer to benefits to third parties, instanced in the case cited, and not unauthorized uses of trust funds which could result only in benefit to the beneficiaries of the trust and to no other parties. In this connection sections 2237 and 2238 of the Civil Code should be noted, where the code distinguished the measure of damages applicable to breaches of trust under section 2229 and where "a trustee . . . uses or disposes of the trust property in any manner not authorized by the trust, but in good faith, and with intent to serve the interests of the beneficiary."

This view is supported by *Alvers* v. *Villa Moret, Inc.,* 46 Cal.App.2d 54 [115 P.2d 238], although the code section is not cited. At page 56 the court said: "The corporation was organized . . . primarily to engage in the business of producing, developing and selling sheet music. Its articles of incorporation, however, bestowed broad general powers, including that to acquire real property, erect buildings, deal in stocks and bonds, borrow and loan money, etc. Accordingly, the purchase of building and loan certificates, the erection of buildings and the investment in the fruit distributing company may be dismissed without further consideration unless in connection therewith there is proof of gross abuse of authority or discretion sufficient at least to approach negligence or fraud. The evidence herein may not be so characterized." "While some of the acts of the directors resulted in unwise invest-

ment, particularly as viewed in retrospect, they do not necessarily—depending upon the facts—constitute gross abuse of discretion.'' The weight of these remarks is somewhat restricted for the reason that in that case the court was upholding the findings of the trial court. However, we find no other evidence in the record to support the lower court's finding of fraud than that defendant engaged in the "highly speculative" silver transactions, hence the case is persuasive authority.

In *Southern Counties Thrift Co.* v. *Rairdon*, 47 Cal.App.2d 770 [118 P.2d 828], although the fraud issue was apparently not raised, the court held that a demurrer to a complaint was properly sustained, the causes of action being barred by subdivision 1 of section 339 of the Code of Civil Procedure, where the complaint alleged "unauthorized and negligent acts . . . in that loans contrary to law were made" by the directors. At the most the transactions here in question were "unauthorized and negligent" hence by implication they do not come under section 338, subdivision 4 of the Code of Civil Procedure, and the causes of action, if there were any, are barred by the sections cited. (*Fox* v. *Hale & Norcross S.M. Co.*, 108 Cal. 369, 424 [41 P. 308].)

No cases have been cited and none have been found on the question before us—whether engaging in a "highly speculative" investment without more constitutes a fraud on the corporation so as to suspend the running of a statute of limitations until discovery has been made. Those cases relied on mainly by respondents are clearly distinguishable. In *Fagerberg* v. *Phoenix Flour Mills Co.*, 50 Ariz. 227 [71 P.2d 1022, 1028], the court emphasized the concealment of the speculations on the wheat market from the other directors of the corporation and the false entries made in the books of the corporation in order to conceal the losses. Here there is no contention that the directors as a board did not authorize the investment nor were the losses covered on the books of the corporation. In *Felsenheld* v. *Bloch Bros. Tobacco Co.*, 119 W. Va. 167 [192 S.E. 545, 123 A.L.R. 334], although the statute of limitations point was involved, it should be noted that the court decided that cases cognizable in equity were governed by a different statute than those cognizable at law and held that any breach of trust by a director, whether by reason of fraud or negligence, would be governed by the equity statute.

Broad language denominating the acts of directors fraud can be found in many cases not involving the question of the statute of limitations applicable to fraud actions as opposed to those for negligence and mismanagement. These cases must be carefully distinguished from the case at bar.

We have assumed for the purposes of argument that these investments in silver were highly speculative as found by the trial court and that a cause of action for negligence on this basis might have lain against the directors here sued. We hold as a matter of law that no fraud was proved, either constructive or actual, upon the corporations which would make section 338, subdivision 4, applicable to the causes of action stated, if any. Whether a finding that such investments constituted actionable negligence on the part of the directors would be upheld, we need not decide.

The Automobile Trip.

There is no dispute as to the facts relating to this count. Appellants have summarized them in their opening brief and respondents concede this summary to be a fair statement. It is as follows:

"He (Odell) first proceeded to Yellowstone Park where he employed the manager of the Park Hotel and his crew for one of Pacific States' hotels; thence to Minneapolis to interview the Receiver for the Radison Hotel there, who later came to California to negotiate for purchase of some of Pacific States' properties. He next visited the Taylor hotels in Rochester and the manager of the Drake and Blackstone in Chicago—thence to Cincinnati to visit a hotel there and the Waco Airplane factory to look at airplanes. (Shortly after that a Waco plane was purchased and became the subject of plaintiffs' Count 'C' upon which judgment went for defendants.) He also stopped at Manchester, Iowa, where he called on the Holbrook Importing Company, importers of breeding stock, and priced their stallions.

"In New York Odell negotiated, with the Equitable Life Insurance Co., a $3,214,200.00 loan, which by reducing the interest rate from the 4½ per cent being paid to 4 per cent, and the appraisal fee from $16,000 to $5,000, saved Pacific States $91,250.00. That saving covered the life of the loan.

"In London Odell induced Lloyds' Underwriters to reduce its 40 per cent earthquake insurance rate to 24 cents and to

include the Barbara Worth Hotel at El Centro in the blanket policy—a saving to Pacific States of $21,564.00.

"In Sweden and Norway he visited hotels; in Berlin he purchased glassware for the Pacific States hotels and visited various porcelain factories that supply the hotels with dishes.

"He also visited hotels in France. In France and Belgium he purchased breeding stock for the Nevada Ranch of Pacific States—the Nevada Ranch is a property approximately 250 miles long and a hundred miles wide, and comprises (including fee and leased lands, and lands occupied under grazing rights) almost 3,000,000 acres.

"In Belgium, for example, Odell bought two Percheron stallions, and two or three mares in France, and four Belgian stallions and about six mares in Belgium. To get 'a decent freight rate and pay for the caretaker and feed', he had to ship 20 horses, so he purchased 18 and added to the shipment 2 horses purchased by a man from Los Angeles, one Frank Powell. Odell had an arrangement with Melcher, Pacific States ranch manager, that when the horses arrived, Melcher would select what Pacific States needed and they would sell the balance. Five of the horses died en route, for which Pacific States was reimbursed through insurance. Melcher selected eight for the Pacific States Nevada ranch and Odell took the remaining five, paying therefor the actual cash outlay on them.

"Odell's wife accompanied him, and he paid all of her expenses. Pacific States paid Odell's expenses, including a flat allowance of $25 a day for meals, etc. Odell submitted this to the Building and Loan Commissioner and he approved $25 a day. Excluding the value of the use of the car and Odell's transportation expense, the expenses of the trip amounted to $1,770. The trip consumed about 10,000 miles. Odell hired a chauffeur to drive the car in Europe, but furnished his own chauffeur at his own expense while in the United States. The cost of operating the car in the United States without the expense of a chauffeur was 5c per mile for 2,800 miles; while the expense of operations for the balance of the 10,000 miles (the European travel) was 7c per mile including depreciation and the cost of the chauffeur, and everything.

"The trial Court found that part of the use of the automobile was devoted to the business of State Guaranty and its

subsidiaries, and part to Odell's private business and pleasure, and that 'the sum of $2,000 represented the pro-rata expenses so paid for the benefit of Robert S. Odell and the fair value of the use of said automobile during the time the same was used by Odell for his personal business and pleasure.' "

From this statement we cannot find any basis for a reasonable inference that the trip was an undertaking partially for the personal pleasure of the defendant Odell. Moreover we are at a loss to find upon what basis the apportionment of the total expense was made. The respondents point to the profit realized by Odell on the purchase of five horses for his own use. If he profited at the expense of the corporation he would be liable therefore, but no such cause of action was pleaded, nor was the judgment based thereon.

We conclude that the cause of action pleaded relating to the silver transactions is barred by the statute of limitations, and that there is no substantial evidence in the record to support the findings of the trial court in relation to the cause of action concerning the trip to Europe; hence the judgment against Odell and Herrick, and Odell, Falch and Adams, respectively, cannot be sustained.

The judgment is therefore reversed.

Spence, J., concurred.

A petition for a rehearing was denied August 25, 1943, and the following opinion was thereupon rendered:

THE COURT.—In their petition for a rehearing respondents criticize our interpretation of section 358 of the Civil Code, and cite *Gertridge* v. *State Capital Co.*, 129 Cal.App. 86 [18 P.2d 375], where it was held that the words "every corporation" used in section 355 applied to foreign corporations as well as to domestic. It should be noted that following that decision in 1933 the Legislature amended section 355 to make it applicable to "foreign corporations keeping any such records in this state," thereby expressly limiting the use of the term "every corporation." The words "such records" refer to corporate minutes, books of account, and share register, all of which are required to be kept by domestic corporations under sections 352, 353, and 354. That these three sections do not require foreign corporations to keep such records is evident from the 1933 amendment to section 355

which was made applicable only to such foreign corporations as should voluntarily keep such records in this state.

It should also be noted that sections 356, 357, 358 and 359 were also amended at the same time as section 355, in 1933; and in the same bill, or chapter. Sections 356, 357 and 359 all expressly refer to foreign corporations. Section 358 does not make such reference, and it would be simple judicial legislation to add those words to the section. We must assume that the Legislature had some reason for permitting shareholders to inspect books of foreign corporations which are kept within the state; and some reason for limiting to domestic corporations the specifications required for an annual report found in section 358.

The petition is denied.

Respondents' petition for a hearing by the Supreme Court was denied September 23, 1943. Carter, J., voted for a hearing.