**RESOLUTION TRUST CORPORATION,**
Plaintiff,

v.

**Clayton J. DEAN, et al., Defendants.**

**No. CIV 91–2026 PHX EHC.**

United States District Court,
D. Arizona.

Feb. 11, 1994.

Charles E. Patterson (argued), Bruce A. Ericson, Pillsbury Madison & Sutro, San Francisco, CA, and Richard C. Sanders, David A. Ingrassia, Hill Lewis Marce, Phoenix, AZ, for plaintiff Resolution Trust Corp.

Lat J. Celmins, Margrave, Celmins & Verburg, P.C., Scottsdale, AZ, for defendant Lewis.

Joseph A. Schenk, Hebert, Schenk & Johnsen, Phoenix, AZ, for defendant Reese.

Gary L. Stuart (argued), Jennings, Strouss and Salmon, Phoenix, AZ, for defendant Symington.

John D. Gordan, III, Lord Day & Lord, Barrett Smith, New York City and Dale A. Danneman (argued), Leslie Keith Beauchamp, Lewis and Roca, Phoenix, AZ, for defendants Dean, Fannin, Griffith, Hess, Kerr, Needham and Newell.

Merwin D. Grant, Law Offices of Merwin Grant, Phoenix, AZ, for defendant Mirabella.

David M. Heller, Tryon, Heller & Rayes, P.C., Phoenix, AZ, for defendant Snow.

Michael D. Hawkins (argued), Daughton Hawkins Brockelman Guinan & Patterson, Phoenix, AZ, for defendants Ludwig and Nat. Bulk Carriers, Inc.

## MEMORANDUM OPINION RE: RULE 12 MOTIONS TO DISMISS AND FOR MORE DEFINITE STATEMENT

CARROLL, District Judge.

This lawsuit arises out of the failure of Southwest Savings and Loan Association ("Southwest"), a federally insured Savings and Loan incorporated under Arizona law. On February 17, 1989, the Federal Savings and Loan Insurance Corporation ("FSLIC") took possession of Southwest as conservator, and the Resolution Trust Corporation ("RTC") succeeded the FSLIC in that role.[1] RTC filed its original complaint on December 16, 1991, and its first amended complaint ("complaint") on February 14, 1992. The eight-count complaint asserts claims against the former directors and officers of Southwest ("the Southwest defendants") for negligence, negligence per se, gross negligence, breach of fiduciary duty and breach of duty of loyalty.[2] With the exception of Matthew Shevlin and Edward McDermott, the complaint names as defendants every person, other than deceased individuals, who served

on Southwest's board of directors from 1984 until conservatorship. The complaint also asserts a claim against the Southwest defendants' Arizona spouses for spousal liability, and a claim against Daniel Ludwig and National Bulk Carriers for the return of unlawful dividends. RTC seeks to hold the defendants liable for over $210 million in damages.

Defendants have filed 20 motions under Rules 12(b)(6) and 12(e), Fed.R.Civ.P. and the RTC has filed a consolidated opposition to the various motions.

### I. Background/Complaint

The complaint is divided into seven sections. The first section sets forth the jurisdictional allegations. The second section identifies the parties and their respective relationship to Southwest. Part B of this section describes each of the defendant directors' and officers' role and tenure at Southwest. Complaint at ¶¶ 12–25. The complaint asserts that the RTC seeks to impose joint liability on each of the officers and directors,

> only with respect to his acts or omissions during the period or periods he served as a director or officer of Southwest, or of any subsidiary of Southwest, or during times when said defendants otherwise owed duties to Southwest, its shareholders and its insurer of accounts as hereinafter described, and the consequences of such acts or omissions then and thereafter.

*Id.* at ¶ 25.

The third section of the complaint sets forth general allegations regarding the Southwest defendants' duties and the breaches of these duties. *Id.* at ¶¶ 30–35. In this section, the complaint asserts that the Southwest defendants owed Southwest, its depositors and the FSLIC, as insurer, fiduciary and other duties requiring them to act prudently in their lending and investment practices and to safeguard the depositors' insured funds and the FSLIC insurance fund. *Id.* at ¶ 31.

1. The RTC succeeded the FSLIC as conservator or receiver with respect to those institutions for which the FSLIC was appointed receiver or conservator from January through August of 1989. 12 U.S.C. § 1441a(b)(6) (1989).

2. Complaint at ¶ 108–125. The fifth claim, breach of duty of loyalty, is asserted only against the director defendants: Dean, Fannin, Griffith, Kerr, Lewis, Mirabella, Newell, Reese, Snow and Symington.

The complaint also asserts that the Southwest defendants owed a duty to carry out their responsibilities at Southwest by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. *Id.* at ¶ 32.

The fourth section of the complaint sets forth fourteen loans or investments as "specific examples of the Southwest defendants' breach of fiduciary duties and gross negligence." *Id.* at ¶¶ 36–78. The complaint recites factual allegations concerning seven of these loans. *Id.* at ¶¶ 36–77. Another seven loans, accounting for more than $55 million of the total damages sought, are summarized in paragraph 78, entitled "Other Imprudent Loans." The complaint states the defendants' breaches of duty are not limited to these 14 transactions:

> [T]hese transactions illustrate the manner in which the Southwest Defendants breached their duties, and together they demonstrate the extent to which the Southwest Defendants willingly used insured deposits to finance speculative real estate acquisition and development projects. Some of these transactions were carried on Southwest's books as loans, although in economic substance they were investments; others (notably Camelback Esplanade) were carried on Southwest's books as investments; and some were denominated loans but accounted for as investments.

*Id.* at ¶ 36.

The fifth section of the complaint alleges improper accounting and auditing practices and improper bonuses and dividend distribution. *Id.* at ¶¶ 79–102. Part A of this section asserts that the Southwest defendants failed to follow generally accepted accounting principles (GAAP) by, inter alia, failing to establish adequate loan reserves, not recognizing losses, obscuring losses that had occurred, describing as loans what were in reality investments, and improperly recognizing contingent interest income. *Id.* at ¶¶ 79–94. Part B asserts that the Southwest defendants, by inaccurately reporting net income for 1986 and by manipulating a Short Term Management Incentive Plan, caused special bonuses to be paid to various Southwest officers. These bonuses are alleged to have violated 12 C.F.R. § 563.17(b) (1972). *Id.* at ¶¶ 91–95. Finally, part C alleges that the Southwest defendants paid and defendants Ludwig and National Bulk received imprudent and unlawful dividends on preferred stock. *Id.* at ¶¶ 96–102.

The sixth section of the complaint sets forth Southwest's losses that allegedly resulted as a direct and proximate cause of the Southwest defendants' claimed breaches of duty. *Id.* at ¶¶ 103–5. Defendants Ludwig and Bulk National are alleged to have received at least $13.4 million in unlawful and imprudent dividends on preferred stock. *Id.* at ¶¶ 104(a). Defendants Dean, Fannin, Griffith, Kerr, Lewis and Newell are alleged to have authorized at least $1.08 million in unlawful and imprudent bonuses, out of which defendants Lewis, Mirabella, Reese and Snow allegedly received $331,792. *Id.* at ¶ 104(b). The complaint also alleges that the Southwest defendants' inaccurate financial statements were designed to, and in fact did, attract new depositors so as to enable Southwest to make more high-risk loans and investments and the RTC, as successor to Southwest's insurer of accounts, became responsible for repaying those depositors upon Southwest's failure. *Id.* at ¶ 105.

Finally, the seventh section of the complaint asserts that any statute of limitations with regard to the claims set forth was tolled from the date that such claims otherwise would have accrued to at least until February 17, 1989, when the FSLIC took possession of Southwest. *Id.* at ¶¶ 106–07.

## II. Motions to Dismiss—Legal Standard

■ In considering defendants' motions to dismiss, the Court must presume that the plaintiff's allegations are true, and grant the motion only if it appears "beyond doubt" that the plaintiff can prove no set of facts entitling it to relief. *Sun Savings & Loan Assoc. v. Dierdorff,* 825 F.2d 187, 191 (9th Cir. 1987); *Federal Sav. & Loan Ins. Corp. v. Musacchio,* 695 F.Supp. 1053, 1058 (N.D.Cal. 1988). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support its

claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Under this liberal standard, motions to dismiss are viewed with disfavor. *Intake Water Co. v. Yellowstone River Compact Comm.,* 590 F.Supp. 293 (D.C.Mont.1983) *aff'd,* 769 F.2d 568 (9th Cir.), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1985).

### III. FIRREA does not bar claims for negligence, negligence per se and breach of duty of care. (Counts I, II and IV)

■ In the various motions to dismiss, defendants argue that the claims for negligence, negligence per se and breach of duty of care are barred by 12 U.S.C. § 1821(k), as added by section 212 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, 243.

Section 212(k) of FIRREA provides:

A director or officer of an insured depository institution *may be held personally liable* for monetary damages in any civil action by [the RTC] ... *for gross negligence,* including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law. *Nothing in this paragraph shall impair or affect any right of the [RTC] under other applicable law.*

12 U.S.C. § 1821(k) (Supp. II 1990) (emphasis added). Movants contend that the RTC's claims not rising to the level of gross negligence are preempted by section 1821(k), which sets a single national standard of liability.

At the time the parties were briefing this issue, the law regarding the effect of section 1821(k) remained unclear in this Circuit, as in many others. However, in the recent decision of *FDIC v. McSweeney,* 976 F.2d 532 (9th Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993) the Ninth Circuit squarely addresses this issue, holding that FIRREA allows claims against former officials of failed financial institutions premised on a lesser degree of culpability than gross negligence, where authorized under state law. *Id.* at 540. To hold otherwise, the *McSweeney* court observes, "would lead to absurd results, creating 'the perverse incentive for a director in an institution that is having financial difficulty to permit the thrift to fall into ruin ... since the director's own exposure would be greatly reduced upon the institution of a receivership.'" *Id.* quoting *FDIC v. McSweeney,* 772 F.Supp. 1154, 1159 (S.D.Cal.1991). *See also, FDIC v. Canfield,* 967 F.2d 443 (10th Cir.1992), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 516, 121 L.Ed.2d 527.

### IV. Negligence (First Claim)

■ Because 12 U.S.C. § 1821(k) does not preclude state law claims based on a lesser degree of culpability than gross negligence, this Court must determine whether, under Arizona law, the RTC may pursue its simple negligence claim.[3] The Southwest defendants argue that, absent some showing that they acted in bad faith, fraudulently or outside the scope of the corporation's business, they cannot be held liable for simple negligence.[4]

In *Fagerberg v. Phoenix Flour Mills Co.,* 50 Ariz. 227, 71 P.2d 1022 (1937), three director defendants were accused of using corporate funds without authority to speculate in wheat futures, and concealing their losses from the corporation, its stockholders and the other directors by making false entries in the corporate books and false reports to the shareholders. 50 Ariz. at 229, 71 P.2d at 1024. In affirming a judgment against the defendants, the Arizona Supreme Court re-

---

**3.** Pursuant to Arizona Revised Statutes § 10–054(A)(9), the liability of a corporation's directors may be limited or, to a certain extent, eliminated through the articles of incorporation. There is no allegation that such a limitation has any relevance in the present action.

**4.** Consolidated motion to dismiss Counts I, III and IV at 4; Snow's motion to dismiss Counts I, III and IV at 3; Symington's motion to dismiss Counts I, III and IV at 2; Lewis' motion to dismiss Counts I, II, III, IV, V and VI at 11.

viewed a challenge (demurrer) to the sufficiency of the complaint and concluded that

> [i]t is the general rule that officers and directors of a corporation are authorized to handle the ordinary business affairs of the corporation according to their best judgments, and, if, acting in good faith within the scope of the corporation's ordinary business, they commit errors of judgment, they are not liable therefor, but it is equally true that, if they go outside of. the ordinary and usual business of the corporation and engage in transactions unauthorized by its articles of incorporation and not within the ordinary scope of its business, without the consent or ratification of the stockholders, then good faith will not excuse them from responsibility to the corporation for any losses which they may have incurred by reason of their unauthorized and illegal conduct.

*Id.* at 230, 71 P.2d at 1025.

*Fagerberg* has been followed in two Arizona decisions concerning director liability. *See Tovrea Land and Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 122, 412 P.2d 47, 62 (1966); *Kadish v. Phx–Scottsdale Sports Co.*, 11 Ariz.App. 575, 466 P.2d 794, 797 (1970). Both cases raise issues concerning actions outside the ordinary scope of corporate business which are issues that are not presently before the Court.

In *Blumenthal v. Teets*, 155 Ariz. 123, 745 P.2d 181 (Ct.App.1987), a shareholder of Greyhound Corporation filed a derivative action against the officers and directors of Greyhound for having approved loans without reasonable inquiry into the collateral or underlying documentation reviewed in deciding to make the loans. *Id.* at 126, 745 P.2d at 184. The loans were made by Greyhound Leasing and Financial Corporation (GLFC), a wholly-owned subsidiary of Greyhound, in apparent reliance upon forged letters, purchase orders, and legal opinion letters supplied by the borrower. *Id.* at 125–26, 745 P.2d at 183–84. Shortly after Greyhound publicly disclosed its problems with the

loans, plaintiff Blumenthal brought an action on behalf of Greyhound against individual officers and directors of both Greyhound and GLFC. *Id.* at 126, 745 P.2d at 184.

On review of the trial court's dismissal of the complaint, the principal issue before the Arizona Court of Appeals was whether the plaintiff was excused from complying with the pre-suit demand requirements of Arizona Rule of Civil Procedure 23.1, which relates to shareholder derivative actions.[5] Defendant was a Delaware corporation and the case was decided under Delaware law. *Id.* at 127, 745 P.2d at 185. The court, quoting *Aronson v. Lewis*, 473 A.2d 805, 808 (Del.1984), found that the demand requirement can only be excused "where facts are alleged with particularity which create a reasonable doubt that the director's action was entitled to the protection of the business judgment rule." 155 Ariz. at 128, 745 P.2d at 186.

> 'In our view the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under Section 141(a). It is a *presumption* that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *Absent an abuse of discretion*, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

> \*    \*    \*    \*    \*    \*

> First, its protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to the benefit which devolves

---

**5.** Ariz.R.Civ.P. 23.1 provides that in a derivative action the complaint shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the

directors or shareholders, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

upon the corporation or all stockholders generally.'

*Id.* at 127–28, 745 P.2d at 185–86 *quoting Aronson,* 473 A.2d at 812 (emphasis added in *Blumenthal;* citations omitted in *Blumenthal* ). Finding this first principle inapplicable to the case at bar, and again quoting *Aronson,* the *Blumenthal* court continued:

'Second, to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. While the Delaware cases use a variety of terms to describe the applicable standard of care, *our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence.*'

*Id.*

The court concluded that the complaint failed to allege gross negligence with sufficient particularity to demonstrate demand futility. *Id.* 155 Ariz. at 130, 745 P.2d at 188. In reaching this conclusion, the court considered the fact that Greyhound is a multi-million dollar holding company which through its subsidiaries engages in transportation, bus manufacturing, services and food service, consumer products and financial services. *Id.* at 129, 745 P.2d at 187. The court found that Greyhound's board of directors could not be expected to have detailed information regarding every transaction of every subsidiary. *Id.* There was no allegation that Greyhound's board of directors knew that GLFC directors, officers, and/or employees failed to authenticate the loan transactions or to conduct a physical inspection of

the collateral. *Id.* Additionally, there was no allegation that Greyhound's board of directors declined to sue any of its own directors or GLFC's directors. *Id.* at 130, 745 P.2d at 188.

As stated above, *Blumenthal* involved a Delaware corporation and the case was decided under Delaware law. Nevertheless, the *Blumenthal* decision strongly suggests that the decision would be the same under Arizona law. The court compared 8 Del.C. § 141(a) [6] to ARS § 10–035 [7] and noted that "[i]n Arizona, like Delaware, the directors rather than the shareholders manage the affairs of the corporation." 155 Ariz. at 127, 745 P.2d at 185. The court also noted that despite these statutes, the board members themselves are not expected to operate the business:

Even under statutes [like Arizona's] providing that the business and affairs shall be "managed" by the board of directors, it is recognized that actual operation is a function of management. The responsibility of the board is limited to overseeing such operation.

*Id. quoting Corporate Director's Guidebook,* 33 Bus.Law 1591, 1603 (1978) (emphasis omitted).

In support of its argument that Arizona law recognizes a claim for simple negligence in the management of corporate affairs, the RTC cites *DePinto v. Provident Security Life Ins. Co.,* 374 F.2d 37 (9th Cir.1967) *cert. denied,* 389 U.S. 822, 88 S.Ct. 48, 19 L.Ed.2d 74 and *cert. denied,* 389 U.S. 822, 88 S.Ct. 52, 19 L.Ed.2d 74. *DePinto* involved a stockholder's derivative action against DePinto, a former director of an insurance company (United), and other individuals and corporations.[8] The theory on which the derivative

---

**6.** 8 Del.C. § 141(a) provides, in pertinent part, that "[t]he business and affairs of a corporation ... shall be managed by or under the direction of a board of directors ..."

**7.** A.R.S. § 10–035 states: "The business and affairs of a corporation shall be managed by a board of directors except as may be otherwise reserved to the shareholders in the Articles of Incorporation."

**8.** The underlying basis for *DePinto,* the diversion of assets of United in connection with its pur-

chase of allegedly worthless shares of an investment corporation (American), spawned numerous lawsuits with procedurally complex histories. *See Mauser v. United Security Life,* 267 F.2d 3 (9th Cir.1959); *DePinto v. Provident Security Life Ins. Co.,* 323 F.2d 826 (9th Cir.1963); *Provident Security Life Ins. Co. v. Gorsuch,* 323 F.2d 839 (9th Cir.1963); *Gorsuch v. Fireman's Fund Ins. Co.,* 360 F.2d 23 (9th Cir.1966); *DePinto v. Landoe,* 411 F.2d 297 (9th Cir.1969); *DePinto v. Landoe,* 475 F.2d 1123 (9th Cir.1973); and *DePinto v. United States,* 407 F.Supp. 1 (D.Ariz. 1975).

action was based was that, by reason of fraud, negligence, breach of fiduciary duty, unjust enrichment and conversion on the part of the individual defendants, assets of United were diverted from that corporation in connection with its purchase of allegedly worthless shares of an investment company. *DePinto,* 323 F.2d 826, 828 (9th Cir.1963).

By the time *DePinto* reached the Ninth Circuit Court of Appeals for its third and final appeal, DePinto and his trustee in bankruptcy, as intervenor, were the only remaining appellants. 374 F.2d at 41. Among DePinto's arguments on appeal was that the trial judge erred in giving the following jury instruction:

> 'The particular acts or omissions on the part of the defendant DePinto, which plaintiffs allege occurred and amounted to negligence or breach of fiduciary duty are as follows: Acceptance of the office of director without intending to discharge the duties and responsibilities of director; delegating or relinquishing his responsibilities as a director to Kelly; failing to attend directors' meetings; failure to examine minutes, records and transactions and documents of the corporation; failure to keep himself advised by reasonable inquiry as to important transactions of the corporation, and particularly as to the transactions in question resulting in the transfer to Kelly of corporate assets; failure to investigate and to require measures for protection of the corporation with respect to conditions and transactions potentially harmful to the corporation and stockholders when such were brought to his attention or of which he should have learned in the exercise of reasonable care, and failure to exercise reasonable care to assure that adequate funds, property, and security be obtained by the corporation in return for the transfer to James E. Kelly of substantial assets of United Security Life.'

*Id.* at 40 n. 1:

Defendant DePinto's objection to the jury instruction was that it invited the jury to find him liable for acts or omission not properly at issue and for which he had not been charged. *Id.* at 47. The Ninth Circuit rejected DePinto's arguments. *Id.*

Nowhere in the various *DePinto* decisions is there a discussion of the business judgment rule or the applicable standard of officer or director liability. It is clear from the jury instruction quoted above that DePinto was being charged with failing to inform himself and failing to act. Thus, the protections of the business judgment rule would arguably be unavailable in such a context.

The most recent Arizona case to discuss the business judgment rule is *Shoen v. Shoen,* 167 Ariz. 58, 804 P.2d 787 (Ct.App. 1990). In *Shoen,* the Arizona Court of Appeals stated "[t]he duty of care is evaluated according to the 'business judgment rule,' which precludes judicial inquiry into actions taken by a director in good faith and in the exercise of honest judgment in the legitimate and lawful furtherance of a corporate purpose." *Shoen* dealt with the application of Nevada law to a Nevada corporation and the *Shoen* court cites no authority, Nevada or otherwise, for its exposition of the business judgment rule.

█ The preceding review of the relevant Arizona case law, particularly *Blumenthal,* satisfies the Court that under the business judgment rule, defendants liability must be predicated upon concepts of gross negligence. However, the business judgment rule "operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson,* 473 A.2d at 813. This position is reconcilable with *DePinto,* which was an action based on the failure to reasonably investigate or to act. *See also, e.g. In re J.P. Stevens & Co., Inc. Shareholders Litigation,* 542 A.2d 770, 780 n. 3 (Del. Ch.1988) *appeal refused* 540 A.2d 1088 (Del. 1988) ("a conscious decision to act or to refrain from action is a necessary factor for the invocation of the doctrine"); *C.f. Hanson Trust PLC v. ML SCM Acquisition Inc.,* 781 F.2d 264, 274 (2d Cir.1986) *quoting Auerbach v. Bennett,* 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (1979) ("where their 'methodologies and procedures' are 'so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham,' then inquiry into

their acts is not shielded by the business judgment rule").

Moreover, "[t]o invoke the business judgment rule's protection, directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Blumenthal*, 155 Ariz. at 128, 745 P.2d at 186, quoting *Aronson*, 473 A.2d at 812. *Accord Gaillard v. Natomas Co.*, 208 Cal.App.3d 1250, 1264–65, 256 Cal.Rptr. 702, 711 (1989) ("directors may not close their eyes to what is going on about them in corporate business, and must in appropriate circumstances make such reasonable inquiry as an ordinarily prudent person under similar circumstances").

While it is clear that, under the business judgment rule, director liability must be based on concepts of gross negligence, it is somewhat less clear what applicable standard governs director liability in situations where the business judgment rule does not apply. In Delaware, the standard for determining whether a business judgment is an informed one is gross negligence. *See* Donald J. Block et al. *The Business Judgment Rule* (3rd Ed.) at 17 (citing cases). This rule grows out of the courts' recognition that "the amount of information that it is prudent to have before a decision is made is itself a business judgment." *In re RJR Nabisco, Inc. Shareholders Litigation* [1988–1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 91,714 (Del.Ch. 1989).

In *Rabkin v. Philip A. Hunt Chemical Corp.*, 13 Del.J.Corp.L. 1210, 1987 WL 28436 (Del.Ch.1987), the court considered a motion for reargument of the court's decision that plaintiffs stated a claim against Hunt directors based upon their alleged failure to learn of a one year price commitment made by defendant Olin Corporation at the time it purchased a majority of the stock of Hunt. The court affirmed its prior holding that: (1) the business judgment rule does not apply to a claim where directors allegedly failed to act

because they were ignorant of the operative facts; (2) the standard of care in a director neglect claim is that which "ordinarily careful and prudent men would use in similar circumstance;" and (3) the complaint adequately alleges a neglect claim against the directors for their failure to learn the terms of the price commitment and to take action with respect to that commitment prior to its expiration. *Id.* at *1, *quoting Graham v. Allis–Chalmers Mfg. Co.*, 41 Del.Ch. 78, 188 A.2d 125, 130 (Del.Supr.1963):

> [U]nder the business judgment rule, directors who undertake their decision making responsibility will not be held liable either for a fault in the decision making process or the decision itself unless they were grossly negligent. It does not seem logical to accord the same deference to directors who abdicate their managerial responsibilities. There would be little meaning to the business judgment rule if, in cases not implicating the duty of loyalty, directors were given the same protection from liability whether it applies or not.

*Id.* at *3. *See also Rabkin v. Philip A. Hunt Chemical Corp.*, 12 Del.Corp.L. 1156, 547 A.2d 963, 972 (Del.Ch.1986).[9]

It has been said that the business judgment rule does not conflict with the concept of negligence. In other words, when courts say that they will not interfere in matters of business judgment, it is presupposed that judgment—reasonable diligence-has in fact been exercised. 3A William Fletcher, *Cyclopedia of the Law of Private Corporations* § 1039, at 45 (rev. perm. ed. 1986). The *Rabkin* decisions are consistent with this position. *See also* William Knepper & Dan Bailey, *Liability of Corporate Officers and Directors* § 6.02 (1988); *Joy v. North*, 692 F.2d 880, 886 (2d Cir.1982) *cert. denied*, 460 U.S 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983):

> whether the directors may be held liable for reaching the wrong decision." 547 A.2d at 970. However, the court also held that the business judgment rule has no bearing on a claim that directors' inaction was the result of ignorance. *Id.* at 972.

9. In a prior published order in *Rabkin*, the court had dismissed plaintiffs' claims that defendants failed to exercise an informed business judgment. Citing *Smith v. Van Gorkom*, discussed infra, the court held that gross negligence is the standard to be applied "in deciding first, whether the directors' decisions were informed, and, if so,

Whatever its merit, however, the business judgment rule extends only as far as the reasons which justify its existence. Thus, it does not apply in cases, e.g., in which the corporate decision lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision.

*Id.*

The RTC argues that the complaint alleges more than enough facts to place the applicability of the business judgment rule or a simple negligence standard into issue. First, the complaint alleges that defendants repeatedly approved large real estate loans without obtaining critical information, such as adequate appraisals of the security, current financial statements, information on prior bankruptcies, credit reports, verification of deposits or tax returns of the borrowers.[10] As an example, the RTC points to its allegations in the complaint with respect to Camelback Esplanade, where the directors are alleged to have approved what was then the largest project in Southwest's history "without any meaningful investigation," "without ascertaining the true price of the land being purchased," and at "a single board meeting ... lasting less than two and one-half hours and at which several other large projects were also considered."[11]

Second, the RTC contends that the business judgment rule does not protect directors from liability for transactions in which the director has a personal interest. The RTC refers to allegations in the complaint that defendants Newell and Lewis approved the Burns loans without disclosing their affiliations to Burns' entities, and defendants Lewis and Mirabella approved the first Paye/Tempe loans shortly after making a large profit in a real estate transaction with

the borrower.[12] The RTC also refers to allegations in the complaint that several directors and officers approved the Camelback Esplanade transaction despite Symington's affiliated person status, and to allegations that defendants Dean, Fannin, Griffith, Kerr, Lewis and Newell benefitted defendants Lewis, Reese and Snow by overstating their performance evaluations and Southwest's income for 1986.[13]

The RTC also points to allegations in the complaint that the directors and officers abdicated their functions by failing to develop adequate loan underwriting, disbursement, record keeping, modification and loss procedures, and failed to heed the warnings of federal and state regulators and accountants about specific transactions and general policies.[14] Finally, the RTC argues that even if defendants could claim a presumption of good faith under the business judgment rule, the complaint alleges facts that, if assumed to be true, are more than sufficient to place the defendants' good faith at issue.[15] As an example of "one of the most obvious breaches of good faith," the RTC points to allegations of defendants' concerted plan to use depositors' funds to engage in an inordinate number of speculative real estate ventures, followed by their cover-up of the resulting losses.[16]

The Court concludes that the complaint alleges facts which, taken as true, cast a reasonable doubt that the defendants' actions are entitled to the protection of the business judgment rule. The complaint is replete with allegations that defendants "failed in their duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Blumenthal,* 155 Ariz. at 128, 745 P.2d at 186. Other allegations concern defendants' abdication of their functions as officers and directors through their failure to develop ad-

10. *Id.,* citing complaint ¶¶ 45, 48, 53, 56, 59, 63, 73, 78.

11. *Id.* at 13–14, quoting complaint ¶ 73.

12. *Id.* citing complaint ¶ 45, 59.

13. *Id.* at 14–15, citing complaint ¶¶ 66 and 91–95.

14. *Id.* citing complaint ¶¶ 33–34.

15. Response at 16, citing complaint ¶¶ 33(e), 33(f), 33(h), 33(j), 35, 43, 45(a), 45(c), 48(f), 59(a), 63(e), 63(f), 71, 76, 78(d)(2), 91–95, 97.

16. Response at 16, citing complaint ¶¶ 33(e), 89–90.

equate·loan underwriting, disbursement, record keeping, modification and loss reserve procedures. Moreover, there are numerous allegations relating to defendants' failure to heed warnings of federal and state regulators and their own accountants about specific problems.

A transaction by transaction determination of the application of the business judgment rule to the allegations contained in the complaint is beyond the scope of the motions presently before the Court and would involve factual determinations. In this regard, application of the business judgment rule is peculiarly a question of fact. *See FSLIC v. Musacchio,* 695 F.Supp. 1053, 1064 (N.D.Cal. 1988).

## V. Gross Negligence Under Arizona Law (Third Claim)

■ FIRREA specifies that defendant officers and directors may be held liable for gross negligence as such term is defined and determined under applicable State law. 12 U.S.C. § 1821(k). Defendants assert that the complaint fails to state a claim for relief as none of the allegations, if proved, would establish a prima facie case of gross negligence under Arizona law, as defined in *Scott v. Scott* and its progeny:[17]

> Wanton [i.e. gross] negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit.

75 Ariz. 116, 122, 252 P.2d 571, 575 (1953); *Walls v. Arizona Dept. of Public Safety,* 170 Ariz. 591, 826 P.2d 1217 (App.1991).

The Arizona courts have yet to articulate a gross negligence standard for director and officer liability. Generally in this context, "[i]f gross negligence be understood as meaning something nearly approaching fraud or bad faith, then the rule is not to be commended and is against the decided weight of the authority." Fletcher, § 1034 at 31; *see also* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 34 at 212 (5th ed. 1984) (gross negligence "differs from ordinary negligence only in degree, and not in kind").

The RTC argues that under Arizona law, the issue of gross negligence is a question of fact and that the complaint includes factual allegations sufficient to support such a claim.[18] *See Walls,* 170 Ariz. at 595, 826·P.2d at 1221 (court may withdraw the issue of gross negligence from the jury only when no evidence is introduced that would lead a reasonable person to find gross negligence); *Coyner Crop Dusters v. Marsh,* 90 Ariz. 157, 367 P.2d 208 (1962) (if there is any evidence upon which to predicate finding of wanton negligence, court should not exclude jury from so finding).

Defendants assert that the allegations in the present action are not dissimilar to those dismissed in *Blumenthal* as failing to rise to the level of gross negligence. However, here, unlike in *Blumenthal,* there are allegations that defendants continued to approve speculative loans despite repeated warnings from federal regulators and accountants that the information defendants relied on was inadequate and, in some instances, the approvals based on such inadequate information were unlawful. Furthermore, there are allegations that defendants approved loans without disclosing their conflicts of interest with borrowers.[19] Finally, there are allegations that defendants approved loans under circumstances where such approvals violated federal and Arizona banking and corporate laws.[20]

The RTC points to allegations in the complaint that defendants failed to inform themselves of critical information about the ability of borrowers to repay, or their speculative real estate projects to support the major

---

17. Consolidated motion to dismiss Counts I, III, and IV at 6; Snow's motion to dismiss Counts I, III, and IV at 7; Lewis' memorandum in support of motion to dismiss Counts I, II, III, IV, V and VI at 13.

18. Response at 21.

19. Complaint at ¶¶ 45, 59, 66, 91, 95, 97.

20. Complaint at ¶¶ 45, 48, 53, 56, 59, 63, 66, 73, 78.

loans they personally approved.[21] Such failure to inform oneself, RTC asserts, by itself demonstrates gross negligence.[22]

In *Smith v. Van Gorkom*, 488 A.2d 858 (Del.1985), a divided Delaware Supreme Court found directors grossly negligent in failing to exercise sufficient deliberation before approving a cash-out merger at a fifty percent premium over the market price. The merger was negotiated by Van Gorkom, the chairman of Trans Union, without consulting the rest of the board. 488 A.2d at 866–67. The board approved the merger in a two-hour meeting, without examining the underlying merger documents. *Id.* at 868–69. No outside expert was consulted as to the fairness of the purchase price. *Id.* at 876. Accordingly, the court found that the directors simply "did not reach an informed business judgment" and "acted in a grossly negligent manner." *Id.* at 874, 884.

Similarly, the RTC's complaint alleges that Southwest's directors approved the Camelback Esplanade project without having seen the joint venture agreements or determined the true purchase price of the property, and having discussed the venture only once, at a two and one-half hour meeting at which the directors also considered and approved a number of other important deals. Complaint at ¶¶ 65–73.

By way of reply, the defendants argue that the *Van Gorkom* decision is severely limited to the context of corporate takeovers.[23] *But see: Briggs v. Spaulding*, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1890) (liability may be predicated on "gross inattention"); *Ford v. Taylor*, 176 Ark. 843, 4 S.W.2d 938 (Ark. 1928) (finding directors grossly negligent after they received a report from a bank examiner that alerted them to the bank's critical condition, but they declined to give close attention to bank affairs).

What constitutes a proper performance of the duties of a director is a question of fact, which must be determined in each case in view of all the circumstances; the character of the company, the condition of its business, the usual methods of managing such companies, and all other relevant facts taken into consideration. Fletcher § 1034 at 31. Defendants' motions to dismiss claims of gross negligence will be denied.

## VI. Negligence Per Se Claim Based on Violation of HOLA (Second Claim)

■ The second claim of the complaint alleges that the Southwest defendants caused, permitted and acquiesced in numerous regulatory violations. Specifically, the RTC alleges that the Southwest defendants violated the following provisions of the Code of Federal Regulations:

> 12 C.F.R. § 545.32(d) (1983 and 1984);
>
> 12 C.F.R. § 545.36(b)(2) (1984);
>
> 12 C.F.R. § 561.29 (1983);
>
> 12 C.F.R. § 563.41(b) (1979);
>
> 12 C.F.R. § 563.41(c)(ii) (1979);
>
> 12 C.F.R. § 536.17–1(c)(1), (i), (iii), (iv), (1983) and (vi) (1983 and 1986); and
>
> 12 C.F.R. § 563.17(b) (1976).

These regulations were promulgated by the Federal Home Loan Bank Board ("FHLBB") pursuant to the Home Owners Loan Act ("HOLA") 12 U.S.C. § 1461 *et seq*. The regulations provide, generally, limitations and requirements relating to loan practices and other operations of federally insured savings and loan associations. For example, 12 C.F.R. § 545.32(d) (1984) proscribes real estate loans that exceed 100 percent of the market value of the security property. 12 C.F.R. § 563.17(b) (1979) provides that compensation to officers and directors shall be reasonable and commensurate with their duties and responsibilities.

The complaint asserts that the alleged violations are actionable as a negligence per se claim "because the regulations establish a standard of care that: (a) relates to the harm

---

**21.** Opposition at 21, citing complaint at ¶¶ 45, 48, 53, 56, 59, 63, 73, 78.

**22.** *Id.* citing *Lewis v. Honeywell, Inc.*, [1987–1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,565, 1987 WL 14747 (Del.Ch. July 28, 1987).

**23.** Consolidated Reply at 12, citing Macy & Miller, *Trans Union Reconsidered*, 98 Yale L.J. 127 (1988) (*Van Gorkom* "should not be understood as interfering with the broad discretion given to corporate boards under the Business Judgment Rule outside the takeover context.")

sought to be prevented by such statutes or regulations; and (b) is raised by RTC in its corporate capacity, as successor in interest to persons within the class which the statutes or regulations seek to protect." Complaint at ¶ 118.

■■ In Arizona, violation of a statute establishes the elements of duty and breach, requiring the plaintiff to prove only proximate cause and damages. *See Cobb v. Salt River Valley Water Users' Ass'n,* 57 Ariz. 451, 114 P.2d 904 (Ariz.1941). It is the prevailing rule, recognized in Arizona, that a breach of a statute intended as a safety regulation is not merely evidence of negligence, but is negligence per se. *Brannigan v. Raybuck,* 136 Ariz. 513, 667 P.2d 213 (Ariz. 1983).

One of defendants' arguments in support of dismissal of this claim is that the HOLA regulations at issue do not provide a damages remedy for their violation.[24] The intent of Congress not to create a damages remedy under HOLA or its regulations, defendants contend, precludes the assertion of a state law claim for negligence per se grounded on a violation of the federal regulation promulgated by the FHLBB.

The RTC does not dispute that the HOLA regulations at issue do not grant it a private cause of action for violations. Such a position would run contrary to the weight of the authority. As the Eighth Circuit Court of Appeals stated in *FSLIC v. Capozzi:*

[W]e likewise discern no congressional intent that the broad-based regulatory protections involved here grant a federal cause of action for damages to a federally insured, state-chartered thrift institution against its former directors. In the context of this type of institution, we believe these regulations are 'forward-looking, not retrospective; they seek to forestall insolvency, not to provide recompense after it has occurred. In short, there is no basis

in the language of the regulations or the promulgating statutes for inferring that a civil cause of action for damages lay in favor of anyone.'

*FSLIC v. Capozzi,* 855 F.2d 1319, 1325 (8th Cir.1988) (quoting *Touche Ross & Co. v. Redington,* 442 U.S. 560, 570–71, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979)) *vacated on other grounds,* 490 U.S. 1062, 109 S.Ct. 2058, 104 L.Ed.2d 624 (1989); *accord RTC v. Hess,* 820 F.Supp. 1359, 1368 (D.Utah 1993); *FSLIC v. Olano,* 1989 WL 54226 (E.D.La. May 17, 1989); *Eureka Fed. Sav. and Loan Ass'n v. Kidwell,* 672 F.Supp. 436 (N.D.Cal.1987); *First Hawaiian Bank v. Alexander,* 558 F.Supp. 1128 (D.Haw.1983).

Instead, the RTC argues that the complaint asserts a claim for negligence and that the regulations merely set the standard of care. Response at 20–21. The RTC claims that it does not seek to create a private right of action under HOLA, "any more than an injured pedestrian seeks to create a private right of action under a statute setting a speed limit." *Id.* at 20. Defendants respond that the distinction between an implied right of action for violation of a statute and a claim of negligence per se based on that violation is ephemeral.

The RTC cites three cases in support of the proposition that defendants can be held liable for negligence per se based on a violation of HOLA regulations. In *FSLIC v. Wilkinson,* No. CIV–89–505–A (W.D.Okla. July 23, 1990) (unpublished opinion), the district court denied defendants' motion to dismiss the negligence per se claim, concluding that: "Holding negligent or willfully errant directors liable in money damages for violations of HOLA and its regulation is consonant with the regulatory scheme and the intent of Congress: that is, ensuring that savings and loan associations are properly managed and financially sound." *Id.* at 4–5.

---

**24.** Consolidated motion to dismiss Count II at 5; Snow's motion to dismiss Count II at 6.

The enforcement of HOLA and the regulation promulgated thereunder rests almost entirely with the Bank Board. *See* 12 U.S.C. § 1464(d). There are only two express provisions for a private right of action to enforce HOLA: (1) "any Federal savings and loan association or director

or officer thereof" may bring an action against the Bank Board under certain circumstances, *see* § 1464(d)(1); and (2) in 1982, Congress amended § 1464 to add a new subsection which expressly provides for a private civil remedy to obtain redress for certain unfair credit practices. *See* § 1464(q)(1).

However, the *Wilkinson* decision is otherwise void of analysis.

The RTC cites another unpublished opinion, *RTC v. Eason,* No. CIV–92–5033 (W.D.Ark., July 16, 1992). In *Eason,* defendant sought to dismiss a count of the complaint asserting a violation of HOLA. The court denied defendant's motion, basing its holding on the RTC's assertion that the count is a "negligence claim, and that the alleged violations serve as evidence of the duties imposed on the directors and officers of a financial institution." *Id.* at 3. The court upheld the count as a negligence claim, not a negligence per se claim, concluding that "evidence of a statutory violation may give rise to an action for negligence." *Id.*

In the third case cited by the RTC, *FSLIC v. Musacchio,* 695 F.Supp. 1053 (N.D.Cal. 1988), the FSLIC alleged that defendant, the founder and principal shareholder of Columbus Savings and Loan, was negligent per se in failing to adhere to various deposit insurance statutes and regulations. Defendant contested whether the plaintiff, as conservator for Columbus, was intended to be protected by the statutes and regulations in question. 695 F.Supp. at 1064. The *Musacchio* court, after discussing the lack of applicable case law before the court, found it was free to either accept or reject the applicability of California's negligence per se presumption. The court elected to accept the presumption, noting that under California law the presumption is permissive, not mandatory; the defendant is free to rebut the presumption, and the fact-finder is free to reject it. Under the circumstances, the court held, "it seems wise to permit the use of federal statutes and regulations as a benchmark for prudent conduct." *Id.* at 1065.

*Musacchio* is distinguishable because in Arizona the presumption is mandatory, not permissive. Thus, in California, even were violations of the regulations assumed, defendants would be entitled to present evidence that they acted as would persons of reasonable prudence under the circumstances, who desired to comply with the law. *See Arney v. United States,* 479 F.2d 653, 660 (9th Cir.1973). In this regard, the negligence per se claims advanced in both *Musacchio* and *Eason* were in legal and practical effect ordinary negligence claims.

Other courts have dismissed negligence per se claims based on federal regulations in general, and HOLA regulations in particular. In *Sanford Street Local Dev. Corp. v. Textron, Inc.,* 768 F.Supp. 1218 (W.D.Mich.1991), *vacated on other grounds,* 805 F.Supp. 29 (W.D.Mich.1991), the court dismissed plaintiff's claim for negligence per se based on alleged violations of the Toxic Substance Control Act ("TSCA"), 15 U.S.C. §§ 2601–29, on the grounds that Congress' decision not to provide an action for money damages preempted that theory of claim:

> A negligence per se claim alleging a violation of the [Toxic Substances Control Act] is little different than an implied right of action under the TSCA for money damages. Since the latter is not available because of Congress' desire to provide aggrieved parties with only equitable remedies, this court finds that the former is preempted as well.

768 F.Supp. at 1224.

In *FSLIC v. Olano,* 1989 WL 54226 at 1 (E.D.La.), the court rejected plaintiff's contention that violation of HOLA regulations should be considered negligence per se and should give rise to a private remedy. The *Olano* court focused solely on the issue of whether HOLA impliedly authorizes a private remedy; it did not consider whether a negligence per se claim may be advanced despite there being no private remedy under HOLA. *Id.*

In the recent decision of *RTC v. Hess,* 820 F.Supp. 1359 (D.Utah 1993), a case which involves many of the same parties as are involved in this action, the court considered a challenge to a claim of negligence per se brought under federal common law with respect to a state chartered, federally insured savings and loan association.

During the period in question in *Hess,* officers and directors could be held liable under Utah law for ordinary negligence. *Id.*

at 1365.[25]   However, the *Hess* defendants could not be found liable for negligence per se under Utah law because the case did not involve a dangerous instrumentality. *Id.* at 1368 n. 14.

*Hess* joined other courts in holding that there is no implied right of action under HOLA. However, the court determined that the lack of an implied private right of action under HOLA does not necessarily preclude the use of particular HOLA regulations to prescribe the standard of care in a federal common law claim for negligence per se:

> There is a distinct difference between bringing a private cause of action derived from the HOLA regulations themselves, and using those same regulations as a standard of care where the underlying cause of action is based on separate statutory or common law.

*Id.* at 1368, *citing Pratico v. Portland Terminal Co.,* 783 F.2d 255, 264–65 (1st Cir. 1985); *Dixon v. International Harvester Co.,* 754 F.2d 573, 581 (5th Cir.1985).

The *Hess* court determined that HOLA regulations may be used as a standard of care in a claim for negligence per se if two requirements are met.   820 F.2d 1368. First, a separate underlying cause of action for negligent mismanagement must exist under federal common law. *Id.* Second, the HOLA regulations establishing the standard of care must satisfy the traditional elements of negligence per se. *Id.*

As to the first requirement, the *Hess* court found that application of federal common law with regard to federally chartered savings and loan institutions is appropriate due to the uniquely federal interests of establishing a uniform approach to director liability. *Id.* However, the court found that the same justification for the application of federal common law does not exist in the case of state chartered, federally insured savings and loan associations. *Id.* at 1370. Accordingly, the court did not determine whether HOLA regulations meet the traditional elements of negligence per se. *Id.* at 1370.

The cases cited in *Hess* in support of the distinction between an implied private cause of action under HOLA and a negligence per se claim using the HOLA regulations as the standard of care, *Pratico* and *Dixon,* supra, both involved the application of a negligence per se claim to an alleged violation of Occupation Safety and Health Administration (OSHA) regulations.   In *Pratico* and *Dixon,* the underlying causes of action were negligence (*Pratico* ) and strict liability and negligent design (*Dixon* ).   In such cases,

> [a]llowing OSHA regulations to act as 'guides for the determination of the standards of care,' should not be viewed as expanding the liability of employers. The doctrine of negligence per se does not have the effect of turning reasonable, nontortious behavior into unreasonable, tortious behavior.   Rather it simply allows the presence of a statutory regulation to serve as irrefutable evidence that particular conduct is unreasonable.

*Pratico,* 783 F.2d at 265.

Arizona courts have adopted legislative standards of conduct when the duties they reflect are recognized at common law. *Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983).   In *Ontiveros,* the Arizona Supreme Court, sitting *en banc,* held that tavern owners are under a duty to exercise due care in ceasing to furnish intoxicants to customers in order to protect members of the public who might be injured as a result of the customer's increased intoxication.   The court found the duty of due care to exist as a matter of common law and of statute; specifically A.R.S. § 4–244(14), which prohibits the serving of alcohol to an intoxicated person.   136 Ariz. at 511, 667 P.2d at 211.   The court drew the following distinction:

> In the case at bench, we adopt a standard of duty by applying recognized theories of tort liability.   We are not creating some new concept previously unrecognized at common law....   The situation is different where the cause of action is of a nature wholly unknown to common law and where, therefore, no cause of action will

---

**25.**  Notably, in 1993, the Utah Legislature enacted a statute limiting director liability to gross negligence. *Id.*

exist unless the statute under consideration expressly confers a private right of action.

*Id.* at 510 n. 3, 667 P.2d at 210 n. 3.

As stated above, the RTC does not dispute that the HOLA regulations do not grant it an implied private cause of action. Thus, through its assertion of a state law negligence per se claim, the RTC is attempting to impose on the defendants a duty unknown in Arizona common law. Such an outcome would be particularly inappropriate where, as here, the action involves a state chartered savings and loan association and, under FIRREA, the extent of officer and director liability is determined in accordance with state law.

The court concludes that under Arizona law, an alleged violation of a HOLA regulation cannot form the duty and breach components of a negligence per se claim directed against officers and directors of a state chartered savings and loan association. Given this conclusion, the Court need not consider whether the HOLA regulations otherwise meet the traditional elements of a negligence per se claim.[26]

## VII. Breach of Duty of Care (Fourth Claim).

■ The fourth claim of the complaint alleges that the Southwest defendants owed Southwest and its shareholders, depositors and insurer of accounts a fiduciary duty to exercise the utmost care, skill, diligence and good faith while carrying out their functions as directors and officers. The claim incorporates the preceding 107 paragraphs of the complaint and alleges that as a direct and proximate result of these breaches of the Southwest Defendants' duty of care, plaintiff has suffered damages exceeding $197 million.

Defendants have moved to dismiss this claim, based on FIRREA and the business judgment rule arguments, discussed above, and defendants' arguments are hereby rejected for the reasons discussed above.

## VIII. Breach of the Duty of Loyalty (Fifth Claim)

■ The fifth claim of the complaint alleges that the Southwest defendants,

owed Southwest and its shareholders, depositors and insurer of accounts a fiduciary duty of loyalty to fully disclose any and all information concerning their dealings with prospective borrowers or investment partners before acting with regard to any loans or investments, and to always place the interests of Southwest and its shareholders, depositors and insurer of accounts ahead of their own personal interests.

Complaint at ¶ 123. The duties are alleged to have arisen, at least in part, upon express and implied contractual obligations. *Id.* Defendants have moved to dismiss this claim for failure to state a claim upon which relief can be granted.[27]

The duty of loyalty "springs from the prohibition against self-dealing that is inherent in a director's fiduciary relationship with the corporation and its shareholders." *Shoen*, 167 Ariz. at 65, 804 P.2d at 794. As the Arizona Supreme Court announced in *Atkinson v. Marquart*, 112 Ariz. 304, 306, 541 P.2d 556, 558 (1975) and repeated in *Master Records, Inc. v. Backman*, 133 Ariz. 494, 497, 652 P.2d 1017, 1020 (1982):

In Arizona a director of a corporation owes a fiduciary duty to the corporation and its stockholders ... This duty is in the nature of a trust relationship requiring a high degree of care on the part of the director ... [A] director does not breach

---

26. The court notes, however, that Arizona courts have never considered a negligence per se claim based on a non-safety regulation, or a federal statute or regulation. *Brand v. J.H. Rose Trucking Co.*, 102 Ariz. 201, 205, 427 P.2d 519, 523 (1967), does not support the RTC's assertion that negligence per se under Arizona law can result from violations of federal statutes and regulations. A.R.S. § 40–605 subsec. 2 grants the Arizona Corporation Commission (ACC) the authority to regulate common carriers. Pursuant to this

power, the ACC adopted the Interstate Commerce Commission's (ICC) Motor Carrier Safety Regulations. Plaintiff's negligence per se claim in *Brand* was based on a violation of the ICC's safety regulations, as adopted pursuant to Arizona law.

27. The breach of loyalty claim is asserted against defendants Dean, Fannin, Griffith, Kerr, Lewis, Mirabella, Newell, Reese, Snow and Symington.

his fiduciary duty so long as he acts honestly and in good faith and breaches no specific duty owing to the corporation ...

■ If there is a showing that a director is personally interested in a transaction, the business judgment rule does not apply, and the burden shifts to the defendant to show that the transaction is fair and serves the best interests of the corporation. *Shoen,* 167 Ariz. at 65, 804 P.2d at 794. A director is not personally interested so long as he neither "appear[ed] on both sides of a transaction nor expect[ed] to derive any personal benefit from it" *Blumenthal,* 155 Ariz. at 128, 745 P.2d at 186.

Citing *Master Records v. Backman* and *Atkinson v. Marquart, supra,* the Southwest defendants assert that in order for a director to be liable for breach of the duty of loyalty, Arizona law requires that a director must further his or her own personal interest through a course of conduct causing "deliberate injury" to the corporation. Both *Master* and *Atkinson* involved claims that defendants were engaging in the same business as the corporation to which they allegedly owed a duty of loyalty; claims that are not present in the case at bar. The Arizona Supreme Court, first in *Atkinson,* then in *Backman,* announced:

> It is not the fact of engaging in a competing business that gives rise to liability. It is the additional circumstances which show a course of conduct of causing deliberate injury to the business and reputation of the corporation that supports a finding of bad faith and resulting liability.

112 Ariz. at 306, 541 P.2d at 558. These cases do not support defendants' assertion that the RTC must show "deliberate injury" in order to state a claim of breach of the duty

of loyalty based on allegations of conflicts of interests in certain transactions.

■ Certain defendants also argue that Arizona law concerning conflicts of interest is codified in A.R.S. § 10–041, which provides that a transaction or contract between a corporation and one of its directors is not necessarily void or voidable simply because of such relationship.[28] The statute, enacted in 1975, does not address whether a director involved in the transaction or contract may have otherwise breached his fiduciary duties to the corporation; rather, the statute addresses the validity of the transaction or contract at issue.

*a. Executive Bonuses*

The following allegations are set forth in paragraphs 91–95 of the complaint: In January, 1986 Southwest's board approved a Short Term Management Incentive Plan ("Incentive Plan"). Defendants Dean, Fannin, Griffith, Kerr, Lewis and Newell voted in favor of the Incentive Plan, under which the executives of Southwest were to receive cash bonuses determined on the basis of Southwest's net income for 1986 and individual executive performances.

The Incentive Plan allegedly motivated the Southwest Defendants to make and approve more loans (whether prudent or not), to book large, unearned fees and points on loans, to modify and extend nonperforming loans, to disguise joint ventures and investments as loans and to report improperly certain amounts as income, all to increase Southwest's apparent income so that certain Southwest defendants would receive larger bonuses. To calculate executive bonuses, the Southwest defendants used Southwest's reported net income, $26 million, when Southwest should have reported a loss in 1986. The claim is that Southwest defendants dis-

---

**28.** A.R.S. § 10–041 provides, in pertinent part:
A. No contract or other transaction between a corporation and one or more of its directors or any other corporation, firm, association or entity in which one or more of its directors are directors or officers or are financially interested, shall be either void or voidable because of such relationship or interest.... if:
1. The fact of such relationship or interest is disclosed or known to the board of directors....; or

2. The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize.... the transaction....; or
3. The contract or transaction is fair and reasonable to the corporation....
A.R.S. § 10–041, Added by Laws 1975, Ch. 69, § 2, eff. July 1, 1976.

regarded an executive's individual performance in calculating the 1986 bonuses and each executive was given a 100 percent score on his evaluation form. By inaccurately reporting net income for 1986 and by manipulating the Incentive Plan, the Southwest defendants paid special bonuses to certain Southwest officers totaling $1,081,580 and including $195,000 to Lewis, $100,000 to Snow and Mirabella and $36,792 to Reese. These special bonuses are alleged to have violated 12 C.F.R. § 563.17(b) (1976) and came at a time when the normal Christmas bonuses were reduced or eliminated for lower level employees.

*i. Dean, Fannin, Griffith, Kerr and Newell*

■ Defendants Dean, Kerr, Fannin, Griffith and Newell (the "outside" directors) have moved to dismiss the breach of the duty of loyalty claim on the ground that the complaint fails to allege that they received any personal benefit by approving the Incentive Plan. Consolidated Motion to Dismiss Count V at 5–6. The RTC responds that allegations of corporate waste state a claim for breach of duty of loyalty. The RTC also argues that the duty of loyalty may be implicated where a director approves transactions or decisions that favor his business associates. Response at 26, citing *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860 (S.D.N.Y.1986).

In a lengthy reply, the outside directors argue that the allegations relating to the Incentive Plain are insufficient to state a claim for breach of the duty of loyalty and that corporate waste is not equivalent to a claim for breach of the duty of loyalty. Moreover, they argue that they cannot breach their duty of loyalty by simply approving corporate transactions benefitting other officers or directors. Consolidated Reply at 20–26.

■ Allegations of excessive executive compensation implicate a director's duty of loyalty to the corporation. *See, The Business Judgment Rule* at 87. Normally, such compensation is measured by a reasonableness standard. *Id.; Wyles v. Campbell,* 77

F.Supp. 343, 346–47 (D.Del.1948) ("where corporate funds are applied to incentive or other compensation of corporate officers, such remuneration must bear a reasonable relation to the value of the services for which the funds are applied").[29] The question of the reasonableness of a corporate officer's compensation is ordinarily a question of fact, as such an inquiry may involve consideration of the services rendered, time devoted to the company, difficulties involved, responsibilities assumed, successes achieved, corporate earnings, and other relevant facts and circumstances. *See Liability of Corporate Officers and Directors,* § 4.10 at 142.

The complaint alleges, *inter alia,* that the directors disregarded the executives' individual performance, inaccurately reported net income and manipulated the Incentive Plan. As these allegations must be taken as true for purposes of the motions presently before the Court, dismissal of the breach of the duty of loyalty claims directed against defendants Dean, Fannin, Griffith, Kerr and Newell would be inappropriate.

*ii. Lewis, Snow, Reese and Mirabella*

Defendants Lewis and Snow have also moved to dismiss the breach of the duty of loyalty claim as it relates to executive bonuses. Defendants Reese and Mirabella have joined in the motions to dismiss filed by the other defendants.

■ Defendant Lewis' principal argument is that "[t]here are no allegations that he profited personally, that he was on both sides of a transaction, or that he was dealing with himself." Lewis' Motion to Dismiss at 14. However, the complaint alleges that, as a director, Lewis voted in favor of the Incentive Plan, and as Southwest's President and Chief Executive Officer, he received a bonus of approximately $195,000 under the Plan. Complaint at ¶ 91, 95. Given the allegations in the complaint concerning inaccurate reporting of net income, disregard of individual performance and manipulation of the Incentive Plan, dismissal would inappropriate. As stated earlier in this memorandum order, the

---

**29.** Because of the intrinsic difficulty of a "reasonableness" analysis, many courts utilize a

waste analysis. *See The Business Judgment Rule* at 88 (citations omitted).

issue before the Court is not whether the plaintiff ultimately will prevail on the merits; dismissal may be granted only if it appears "beyond doubt" that the plaintiff can prove no set of facts entitling it to relief.

■■■ The complaint does not allege that defendant Snow was a member of Southwest's board of directors or was on the compensation committee. In his motion to dismiss, Snow argues that the complaint merely alleges that he breached his duty of loyalty by having his performance evaluated by the directors and by accepting a bonus voted on by the Southwest board of directors. Thus, Snow argues that the complaint lacks any factual allegations to support a claim for breach of the duty of loyalty.

Defendant Snow's argument ignores paragraph 92 of the complaint, which alleges that the Incentive Plan motivated the Southwest defendants "to make and approve more loans (whether prudent or not), to book large, unearned fees and points on loans, to modify and extend nonperforming loans, to disguise joint ventures and investments as loans and to report improperly certain amounts as income."

### b. Burns Loans

■■■ Between 1982 and 1988, Southwest allegedly made several loans totaling over $21 million to two entities controlled by William Robert Burns. Complaint at ¶ 37. Paragraph 45(a) of the complaint alleges that while serving as Chairman of Southwest, defendant Newell was a trustee for several Burns trusts and a general or limited partner in six or more Burns partnerships, and defendant Lewis' son Rich was employed by the Adams Group, one of Burns' companies. Neither Newell nor Lewis, the complaint alleges, disclosed his affiliations with Burns before approving various Burns loans. Complaint at ¶ 45(a)

Defendant Newell argues that the RTC has failed to state a claim under a breach of the duty of loyalty as the complaint does not allege bad faith, deliberate injury to the corporation or any benefit to Newell personally. Consolidated Motion to Dismiss Count V at 6. The RTC responds that the question of

personal interest is a question of fact, and thus cannot be resolved on a motion to dismiss. Response at 32–33 citing *Drobbin*, 631 F.Supp. at 880.

Defendant Lewis asserts that the complaint is fatally defective in that it fails to allege any facts that would constitute self-dealing or demonstrate a self-interested profit motive. The RTC responds that a conflict of interest may arise not only through one's own personal affiliation with another entity, but also through one's relatives.

Defendants suggest that, for a conflict of interest to exist, the director's personal and direct interests must be at issue. However, Section 1.23 of the American Law Institute's, *Principles of Corporate Governance*, Part IV, cited by various defendants in other contexts, provides that a director or officer is "interested" if, *inter alia*, he or an associate, or a person with whom he has a business, financial or familial relationship, has a material pecuniary interest in the transaction and that interest and that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation. The ALI also defines an interested director or officer as one subject to a controlling influence by a party to the transaction or a person who has a material pecuniary interest in the transaction, and that influence could reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation. *Id.* at § 1.23(4). *See also, Drobbin*, 631 F.Supp. at 879 (conflicts of interest may arise not only out of personal business interest, but also out of desire to favor friends, family, or business associates).

The Court agrees with the RTC that the question of personal interest is a question of fact. Accordingly, the Court will deny defendants Lewis' and Newell's motions to dismiss as they relate to Burns' loans allegations.

### c. Paye/Tempe Loans

■■■ Between September 1984 and January 1985, the Southwest defendants approved two loans to John Paye totaling about $4.7 million and a loan to Tempe Associates, of which Paye was the general partner, of about $8.1 million. Complaint at ¶ 58. Paragraph

59(a) of the complaint alleges that defendants Lewis and Mirabella voted to approve the Tempe Associates and Paye loans despite making a profit of $125,000 by selling approximately 10 acres in south Phoenix to Tempe Associates approximately one month before they processed and approved these loans.

Defendant Lewis has moved to dismiss the claim of breach of duty of loyalty founded on these transactions, claiming that the "alleged disloyalty and personal profit motive is all innuendo." Lewis points out that there is no allegation of kickback, or of a tie-in between the sale and the loan. Lewis' Reply at 9. Again, the question before the Court is not whether the RTC will ultimately prevail on these claim. Rather, the question before the Court is whether it appears "beyond doubt" that the RTC can prove no set of facts entitling it to relief.

#### d. Symington [30]

■ Paragraphs 65 through 77 of the complaint relate to the Camelback Esplanade transaction. The complaint alleges that defendant Symington, who was to receive 19% of the profits from the sale of the land, did not fully disclose the terms of the transaction to the Board of Directors prior to their approval of the project. For example, the complaint alleges that Symington failed to disclose that the true purchase price of the property was in excess of $31.35 million, and not the $25.9 million that was represented to the Board. Complaint at ¶ 68. The RTC argues that the terms of the transaction were grossly unfair to Southwest and patently one-sided in favor of Symington.

In his motion to dismiss the claim of breach of duty of loyalty, Symington argues that all the law requires is that the fact of a relationship or interest be fully disclosed to the board and that the transaction be ap-

proved by sufficient vote without counting the vote of the interested director. Symington argues that he informed the board of his interest and abstained from the vote. In response, the RTC argues that the complaint plainly alleges that Symington failed to disclose fully the terms of the Camelback Esplanade project and placed his personal interest in it ahead of Southwest's, and that the project was inherently unfair to Southwest.

Because the parties do not agree upon whether defendant Symington disclosed to the Southwest board his interest in the Camelback Esplanade transaction, dismissal of the complaint as it relates to this allegation is inappropriate.[31]

#### e. Thunderbird Valley

■ In 1985, Southwest allegedly loaned approximately $16 million to Thunderbird Valley Property Partners. Complaint at ¶ 78. At that time, defendant Newell was serving as a director and the Chairman of Southwest. Id. at 20. The complaint alleges that defendant Newell failed to disclose that he had a financial interest in a venture owned by Thunderbird Valley Property Partners. Id. at ¶ 78(d). Southwest is alleged to have lost $5 million on the Thunderbird Valley loan. Id.

In his motion to dismiss, defendant Newell disputes the sufficiency of this claim in that there are no allegations that Newell had a financial relationship with the borrower, that Newell profited from his interest from the loan or from his interest in a different entity owned by the borrower, or that Newell caused any deliberate injury to Southwest.

Because the issue of personal interest inherently involves factual determinations, the Court will deny defendant Newell's motion as it relates to the allegations concerning the Thunderbird Valley transaction.

**30.** On November 9, 1992, defendant Symington moved for summary judgment on statute of limitations grounds. The Court denied this motion. *See* Order dated July 20, 1993 (Dkt. # 183).

**31.** Attached to his motion to dismiss, defendant Symington attaches the minutes of the Southwest board meeting of September 21, 1983. The minutes are intended to demonstrate that defendant

Symington abstained from the board's vote approving the Camelback Esplande project. Court will disregard the minutes for purposes of the motion to dismiss because the evidence lacks any foundation and this Court has not given the RTC opportunity to present rebuttal evidence pursuant to Fed.R.Civ.P. 12(b). *See Underwood v. Hunter,* 604 F.2d 367, 369 (5th Cir.1979).

## IX. Recovery of Improper Dividends (Sixth Claim)

■ Defendant Lewis is the sole defendant to move for dismissal of the Sixth Claim of the complaint which asserts joint and several liability against the directors under A.R.S. § 10–048 for the payment of certain preferred dividends in violation of specific Arizona statutes. Lewis' Motion to Dismiss at 15. Lewis argues that federal regulation of savings and loans is so pervasive the it preempts state law:

> The claim of the RTC that defendants should be liable for dividends allegedly issued in violation of Ariz.Rev.Stat.Ann. §§ 6–441, 6–442, 10–045 and 10–1046 ignores the fact that federal regulation had preempted state law. In particular, 12 C.F.R. §§ 563.13 and 563.14 (1983) governed the declaration of dividends by federally insured Savings and Loans and supplanted Arizona law.

*Id.* citing *Fidelity Fed. Sav. and Loan Assoc. v. De La Cuesta,* 458 U.S. 141, 161–162, 102 S.Ct. 3014, 3027, 73 L.Ed.2d 664 (1982); *Rettig v. Arlington Heights Fed. Sav. and Loan Assoc.,* 405 F.Supp. 819, 827 (N.D.Ill.1975).

The RTC responds that Lewis' reliance on *De La Cuesta* is misplaced. In *De La Cuesta,* the court considered whether a FHLBB regulation permitting federally-chartered savings and loan institutions to use due-on-sale clauses preempted a California law which limited a lender's right to exercise such a clause. The court held that where Congress has empowered an administrator to promulgate regulations, the promulgated regulations intended to preempt state law have that effect unless the administrator exceeds his statutory authority or acts arbitrarily. In this case, the court found that the language of the FHLBB regulation at issue clearly shows the FHLBB's intent to preempt the California law. Moreover, the court found that while compliance with both the federal regulation and the state law may not be a physical impossibility, the California rule creates an obstacle to the accomplish-

ment of the regulation's purpose. *Id.* at 154–159, 102 S.Ct. at 3022–25.

As the RTC points out, Lewis cites no explicit language in the federal regulations demonstrating any intent to preempt state law governing the payment of dividends. Nor does Lewis raise any conflict between the federal regulations and Arizona statutes governing the payment of dividends. Finally, the cases cited by Lewis both involve federally chartered savings and loan, in contrast to the state chartered Southwest. The Court agrees with the RTC's assertion that this distinction "makes it all the more doubtful that the FHLBB intended to preempt an Arizona statute governing the internal affairs of Arizona chartered institutions." Response at 35, citing *Bleecker Assoc. v. Astoria Fed. Sav. & Loan Ass'n,* 544 F.Supp. 794, 797–98 (S.D.N.Y.1982) (distinguishing *De La Cuesta* because institution was state-chartered).

## X. Motion for a More Definite Statement

With the exception of defendant Symington, who has filed an answer to the complaint, and defendants Ludwig and National Bulk Carriers, all named defendants have filed motions for a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.[32] Defendants argue that the RTC's failure to differentiate among defendants and apprise them of which transactions they are allegedly responsible for renders the complaint vague and ambiguous within the meaning of Rule 12(e). Defendants also argue that the complaint violates Rules 8 and 10(b) of the Federal Rules of Civil Procedure. In a combined response, the RTC opposes these motions.

■ Under the notice pleading requirements of the Federal Rules of Civil Procedure, all that is necessary is a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Under Rule 12(e), "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move

---

**32.** Separate Rule 12(e) motions have been filed by the following defendants: (1) Lewis; (2) the Mirabellas; (3) Reese; (4) Snow; and (5) Dean, Hess, Fannin, Griffith, Kerr, Needham and Newell.

for a more definite statement before interposing a responsive pleading." Rule 12(e) is designed to strike at unintelligibility rather than want of detail. *Woods v. Reno Commodities, Inc.*, 600 F.Supp. 574, 580 (D.Nev. 1984); *accord Cox v. Maine Maritime Academy*, 122 F.R.D. 115 (E.D.Mich.1988). Such motions are not favored by the courts "since pleadings in the federal courts are only required to fairly notify the opposing party of the nature of the claim." *A.G. Edwards & Sons, Inc. v. Smith*, 736 F.Supp. 1030, 1032 (D.Ariz.1989); *accord Farah v. Martin*, 122 F.R.D. 24, 25 (E.D.Mich.1988). A motion under Rule 12(e) should not be used to test an opponent's case by requiring them to allege certain facts or retreat from their allegations. *Id.*

Under Rule 10(b), "[e]ach claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth."

*a. Discussion*

The structure of the complaint is outlined in the initial sections of this memorandum and order. Defendants' principal grievance is that the complaint fails to identify the misconduct each individual defendant is charged with and the specific losses of Southwest's for which the RTC seeks to hold an individual defendant responsible.

Virtually all of the acts in question are alleged to have been committed by the "Southwest Defendants" as a group, even when some of them had not yet begun their association with Southwest at the time of the alleged acts. Paragraph 29 of the complaint defines "Southwest Defendants" to mean the directors and officers listed in paragraphs 12 through 24. Paragraph 25 of the complaint purports to limit the liability of the individual "Southwest Defendants" to acts and omissions during the time they owed a duty to

Southwest, and the damages proximately caused by such acts or omissions:

> RTC seeks to impose liability on each of the [Southwest Defendants] only with respect to his acts or omissions during the period or periods he served as a director or officer of Southwest, or any subsidiary of Southwest, or during times when said defendants otherwise owed duties to Southwest, its shareholders and its insurer of accounts as hereinafter described, and the consequences of such acts or omissions then and thereafter.

Complaint at ¶ 25.

With regard to allegations relating to the seven loans referred to in paragraphs 37–77 as specific examples of the Southwest defendants breach of fiduciary duties and gross negligence, this Court finds the complaint neither vague nor ambiguous.[33] In this section, the complaint sets forth with sufficient specificity the dates of the transactions and the acts and omissions that allegedly constitute the basis of defendants' liability. Any confusion or ambiguity relating to the identity of the parties involved in these seven loans can be resolved by reference to the individual defendants' tenure at Southwest, set forth in paragraphs 12 through 25 of the complaint, and through discovery.

Following the allegations relating to the seven loans discussed above, the complaint lists seven "[o]ther major investments or loans" of over $5 million allegedly involving violations of law or breaches of duty.[34] The complaint describes these seven investments or loans in varying degrees of specificity, but none to the degree of specificity provided in the previous section. While the complaint sets forth the alleged violations of law and breaches of duties related to the loans or investments, the date·of the alleged transaction is expressed only in the most general of terms. For example, with regard to the Arrowhead Ranch loans, the complaint contains the following allegations:

---

**33.** These seven loans include: the Burns loan; the Westcor/Westech loans; the Mehl/La Paloma loans; the Berk/Desert Reserve loans; the Paye/Tempe loans; Hall/Alma School & Elliot, Ltd. loans; and the Camelback Esplanade transaction.

**34.** Complaint at ¶ 78. The other major investments or loans are listed as follow: Hrebec; Arrowhead Ranch; Dickerson; Thunderbird Valley; Lake Biltmore; Spiekerman; and Euromont. *Id.*

Several loans to Arrowhead Pointe Corporation and related entities between 1986 and 1988 totaling approximately $34 million resulted in losses as yet undetermined. Violations of law or breaches of duties include:

(1) Loans were approved without adequate appraisals of security or adequate financial statements from the borrower or guarantor.

(2) Disbursements were advanced in excess of that allowed by the loan agreements.

Complaint at ¶ 78(b). As defendant Mirabella notes in his motion for a more definite statement, during the two year time frame that these unspecified loans were allegedly made to Arrowhead, three directors (Griffith, Kerr and Lewis) left Southwest's board of directors, and one officer (Snow) left Southwest's employ. Mirabella and Hess joined the board of directors during this time frame. The complaint does not specify which of the several Arrowhead loans form the basis of the RTC's allegations. Thus, at least six of the Southwest defendants, and their spouses, have no way of knowing whether the RTC's claims as to the Arrowhead loans are asserted against them.

Notably, defendant Symington, the only defendant to have filed an answer, filed a general denial in response to the seven "other major investments or loans."

By way of a notice of supplemental authority, the Court has been referred to an order recently issued by Judge Broomfield in *RTC v. Blasdell*, CIV 93–199–PHX–RCB, an action against the former officers and directors of Sentinel Federal Savings & Loan Association. In paragraph 57 of the *Blasdell* complaint, the RTC presents a list seven "unsafe or unsound transactions," and the corresponding losses as a result of the transaction. Judge Broomfield held that the mere name of the transaction and the alleged amount of loss fails to provide fair notice to defendants of the grounds for plaintiff's claim. Order of August 17, 1993 at 37. The RTC was ordered to provide the following additional information: (1) the date or dates of each transaction, (2) the identity of the persons or entities involved in each transaction, (3) a brief statement regarding the unsafe or unsound nature of the transaction, and (4) the identity of the defendant alleged to be involved in each transaction.

Returning to the present action, the RTC complaint arguably complies with the second and third criteria listed by Judge Broomfield. If given the specific date of the alleged transactions, individual Southwest defendants will be able to discern, utilizing paragraphs 12–25, whether they were involved in the transactions. Thus, with the specific date of the alleged transactions, the complaint will satisfy the first and fourth criteria listed by Judge Broomfield.

The Court finds the allegations contained in paragraph 78 deficient under Rule 12(e) insofar as defendants cannot reasonably be required to frame an answer to the allegations. Accordingly, the Court will grant plaintiff RTC thirty days from the date of this order in which to amend paragraph 78 to include specific dates of alleged transactions. Defendants will have thirty days after the filing of the amended complaint within which to file their respective answers.

Finally, paragraph 36 of the complaint provides that the 14 transactions referred to in the complaint represent a non-exclusive illustration of the manner in which the Southwest defendants breached their duties. This paragraph arguably implies that the RTC seeks to base its claims on transactions not set forth in the complaint.

A complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). To the extent that the RTC intends to base its claims on transactions not set forth in the complaint, the RTC has failed to give the defendants notice of the grounds upon which its claims rest. *RTC v. Hess*, 820 F.Supp. at 1370; *FDIC v. Wise*, 758 F.Supp. 1414, 1420 (D.Colo.1991).

## XI. Motion to Dismiss Defendants Ludwig and NBC (Eighth Claim)

The complaint states one claim against Daniel Ludwig, now deceased, and National Bulk Carriers ("NBC"), a corpora-

tion owned and controlled by Ludwig. This claim is based on the defendants' receipt of over $13.4 million in allegedly imprudent and unlawful stock dividends paid between 1983 and 1988.[35] Defendants Ludwig and NBC have moved for dismissal of this claim.

As a threshold issue, this Court must determine whether the RTC is capable of bringing suit directly against the recipients of the allegedly unlawful and imprudent dividend distributions. Arizona Revised Statute § 10–048(D) provides:

> Any director against whom a claim shall be asserted under or pursuant to this section for the payment of a dividend or other distribution of assets of a corporation and who shall be held liable thereon, shall be entitled to contribution from the shareholders who accepted or received any such dividend or assets, knowing such dividend or distribution to have been made in violation of this chapter, in proportion to the amounts received by them.

A.R.S. § 10–048(D) Added by Laws 1975, Ch. 69 § 2 eff. July 1, 1976. Thus, pursuant to section 10–048(D), if a director is sued for the return of an improper dividend, the director is permitted to seek contribution from a shareholder that receives the dividend with knowledge that such dividend was improper.

Defendants Ludwig and N.B.C. argue that section 10–048(D) is the exclusive remedy for the recovery of improper dividends from shareholders. The RTC responds that section 10–048(D) applies the generally observed distinction between active and passive culpability, but the rationale for permitting contribution in favor of a culpable director from a shareholder who shares in that culpability has no application to a primary claim by the RTC in its corporate capacity. The RTC cites no authority in support of this position and admits that it can not recover the dividends from both the directors and Ludwig/NBC if both are found liable of the same unlawful dividends. Response at 37, n. 26. In such a case, the RTC proposes that Ludwig's/NBC's knowledge of the illegality of the dividend distribution should affect an apportionment of liability for the losses.

This lawsuit arising out of the failure of Southwest presents many complex issues of first impression in this jurisdiction, as evidenced by the length of this opinion. As a savings and loan association, ·Southwest had many depositors in federally insured accounts. Yet as a corporation, defendant Ludwig owned all outstanding common stock and Ludwig and his wholly owned corporation, NBC, owned all of the outstanding preferred stock. Defendant Ludwig presumably had the power to appoint and replace all the board members. Moreover, through consideration of defendant Symington's motion for summary judgment, the Court learned that in 1985, Ludwig executed an indemnity agreements in favor of Southwest's executive officers and directors. See Order of July 20, 1993 at 5.

The clear intent and purpose of § 10–048(D) is to protect innocent shareholders who receive unlawful dividends, and conversely, to impose liability upon shareholders who knowingly accept unlawful dividends. Allowing the RTC to go forward with its claim against Ludwig and NBC (presuming the claim does not fail for other reasons) will give effect to the intent of § 10–048(D) in this particular circumstance.

#### a. Knowledge

██ The complaint does not allege that defendants had actual knowledge of the allegedly improper dividend · distribution. Rather, the complaint at paragraph 102 asserts:

> From and after June 6, 1984, defendant Kerr held a general power of attorney for Ludwig, authorizing him to act for and on behalf of Ludwig with regard (among other things) to any activities involving Southwest. As both a holder of Ludwig's general power of attorney and a Southwest director between October 24, 1984 and September 13, 1988, Kerr's actual or constructive knowledge of the matters alleged above· regarding the illegality and impru-

---

**35.** The RTC has also filed a motion for leave to file a second amended complaint. The second amended complaint, if allowed, will add as defendant. the trustee for the Daniel K. Ludwig Unitrust.

dence of dividend payments between 1984 and 1988 would be imputed to Ludwig and National Bulk.

Defendants argue that in order to establish liability, pursuant to A.R.S. § 10–048(D), the RTC must plead and prove that Ludwig and NBC had knowledge of the alleged illegality of the dividends.

The RTC argues that "[b]y its terms, section 10–048 does not apply to this case. Nor is there any policy reason why section 10–048 should apply where suit is brought by an innocent party such as RTC." In support of this argument, the RTC refers to dividend recovery statutes in Michigan, Iowa and Minnesota that do not require shareholder knowledge. Response at 37. However, as defendants accurately observe, these statutes merely highlight the differences between Arizona and those states that have changed the common law requiring shareholder knowledge.

The RTC also argues that there is a split of authority as to whether shareholder knowledge is required at common law. Response at 37 quoting Fletcher, *Cyclopedia Corporations*, § 5423 at 101. In *McDonald v. Williams*, 174 U.S. 397, 19 S.Ct. 743, 43 L.Ed. 1022 (1899), the Supreme Court held that a receiver of a national bank cannot recover a dividend declared and paid out of capital at a time when the bank was not insolvent, where the stockholder received the same in good faith, believing that it was paid out of profits. *McDonald* has been followed by other federal courts and the rule there adopted applied with respect to other corporations. *See* Fletcher, *supra*, § 5423 at 101, citing cases.

In *McDonald*, the defendants, neither of whom was an officer or director, were ignorant of the financial condition of the bank, and received the dividends in good faith, relying on the officers of the bank, and believing the dividends were coming out of the profits. 19 S.Ct. at 743. The Court rejected the argument that corporate capital is held in trust for creditors. *Id.* at 399, 19 S.Ct. at 744. The RTC argues that *McDonald*, which

has rarely been cited, should not control where the defendant owned all the common stock, owned or controlled all the preferred stock, selected all the directors, gave his power of attorney to a director and was a highly sophisticated businessman.

Even if knowledge were required to hold a shareholder liable for the receipt of improper dividends, paragraph 102 of the complaint alleges that, as both a holder of Ludwig's general power of attorney and a Southwest director between October 24, 1984 and September 13, 1988, defendant Kerr's actual or constructive knowledge would be imputed to Ludwig. Defendants respond that the power of attorney is insufficient for establishing knowledge on the part of Ludwig and NBC.

Defendants contend that a power of attorney is to be narrowly construed and that Kerr's knowledge cannot be imputed to Ludwig because the power of attorney provides that it takes two signatures to bind Ludwig. Defendants have attached a copy of the power of attorney to their Rule 12 motion. Because defendants have gone outside of the record, the RTC argues that this Court cannot decide defendants' motion under Rule 12(b).

Because Kerr is the only attorney in fact who was also a Southwest director, even assuming that Kerr had actual or even constructive knowledge of the alleged impropriety of the dividends, the defendants argue that he was not acting jointly with another attorney in fact.

As the RTC points out in its response, Kerr's authority to act on behalf of Ludwig is not at issue.[36] What is at issue is Ludwig's knowledge of Kerr actions, and the Court finds this issue presents factual considerations that cannot be resolved by a motion to dismiss.

*b. Statute of Limitations*

▇▇▇ Finally, defendants Ludwig and NBC assert that the claims against them are actions in tort rather than in contract and

---

**36.** Notably, counsel for the RTC asserted during oral argument that on certain occasions, Kerr

acted singly under the power of attorney.

therefore are barred by the applicable statute of limitation. Motion at 7. Defendants contend that the action sounds in tort because it concerns duties imposed by law rather than by contract. Under the three-year statute of limitation for tort actions, the defendants argue that any dividends declared and paid more than three years prior to the institution of this lawsuit are time-barred. *Id.* Attached to defendants' Motion is a list of dividend payments falling outside the three-year time period.

The RTC responds that the statute of limitation does not bar RTC's recovery because 12 U.S.C. § 1821(d)(14) extends the limitation period that would have applied if the receivership had not occurred. Response at 41, citing Order filed Feb. 25, 1992, at 3–4. Thus, as long as the state statute of limitation had not run as of February 17, 1989, the date Southwest was placed into conservatorship, the RTC argues that § 1821(d)(14) controls, extending the statute of limitation three years for tort claims and six years for contract claims (from the date of conservatorship).

The state statute of limitation for the payment of unlawful dividends is four years. A.R.S. § 10–048(D), (F). The RTC argues that if the receipt of unlawful dividends is not governed by that statute, then it would be governed by the general statute of limitation for quasi-contract: three years. A.R.S. § 12–543.

In their reply, defendants argue that because this claim is essentially based on a statutory obligation restricting the declaration of dividends, A.R.S. § 12–541 provides that the action must be pursued within one year.[37]

Additionally, the RTC argues that the running of the statute of limitation may be suspended by a period of adverse domination of the affected corporation by the wrongdoers. Response at 42. Paragraphs 106 and 107 of the complaint, alleging adverse domination

and fraudulent concealment, are incorporated by reference into the claim against Ludwig and NBC. RTC asserts that, despite the exercise of due diligence, it was prevented from either bringing or recognizing the claims against these defendants until sometime after February 17, 1989. Response at 43.

As to this argument, the defendants reply that the complaint does not allege that Ludwig or NBC concealed facts or dominated the officers or directors of Southwest. However, the complaint does allege that Ludwig was Southwest's sole shareholder and the Southwest officers and directors were indebted to Ludwig for their positions. Complaint at ¶ 96.

The Court has already found that statute of limitations arguments are better made in a motion for summary judgment, where the Court can go beyond the face of the complaint, or otherwise at trial. Order filed February 25, 1992. Accordingly, defendants Ludwig's and NBC's motion to dismiss will be denied.

## XII. Conclusion

Pursuant to Court Order entered this day, defendants' motions to dismiss the negligence per se claim will be **GRANTED**.[38]

Defendants' motions to dismiss the ordinary negligence claim (first claim), the gross negligence claim (third claim), the breach of the duty of care (fourth claim), the breach of the duty of loyalty (fifth claim), improper dividend distribution claim (sixth claim) and repayment of dividends claim (eight claim) will be **DENIED.**

Defendants' motions for a more definite statement will be **GRANTED IN PART AND DENIED IN PART.** Plaintiff RTC will have thirty days within which to file an amended complaint consistent with the Court's Order. Defendants will have thirty

---

**37.** Defendants' motion to dismiss argues a three-year limitation. RTC then responds, arguing that it should be a four-year limitation under § 10–048. If not four years, the RTC argues that it should be three years under A.R.S. § 12–543 (quasi-contract). The defendants then reply that it should be one year under § 12–541.

**38.** For the convenience of the Clerk of the Court, the Court and the parties, the Court will enter a contemporaneous order granting or denying twenty individual motions discussed and disposed of in this memorandum and order.

days thereafter within which to file their respective answers.